UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| IN RE: | Chapter 11 |
| ZEIGER CRANE RENTAL, INC., ATLANTIC LEASING, INC. and DYER ROAD PROPERTY, LLC, | Case No. 11-14183-BKC-EPK (Jointly Administered) |
| Debtors. | |

## FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF REORGANIZATION

HINSHAW & CULBERTSON, LLP
Michael D. Seese, Esq.
One East Broward Boulevard, Suite 1010
Ft. Lauderdale, Florida 33301
Telephone No. (954) 467-7900
Facsimile No. (954) 467-1024

Dated: August 10, 2011
West Palm Beach, Florida

18513698v1 0920630

**DISCLAIMER:**

THE INFORMATION CONTAINED IN THIS FIRST AMENDED DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") AND EXHIBITS HERETO RELATES TO THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION (AS IT MAY BE AMENDED, SUPPLEMENTED OR OTHERWISE MODIFIED) (THE "PLAN"), AND ARE INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON SUCH PLAN.   NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ATTACHED OR REFERRED TO IN THE PLAN AND THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH 11 U.S.C. § 1125 AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER LAWS GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF THE BANKRUPTCY CODE.   THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SEC APPROVED OR DISAPPROVED OF THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND EXHIBITS HERETO WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.   THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.

NO PARTY IS AUTHORIZED TO PROVIDE TO ANY OTHER PARTY ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE CONTENTS OF THIS DISCLOSURE STATEMENT.    THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT RELY ON ANY

INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD-LOOKING PROJECTIONS AND FORECASTS BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES, AND ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THE PROJECTIONS AND FORECASTS SET FORTH HEREIN. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT, EXPRESS OR IMPLIED, IS INTENDED TO GIVE RISE TO ANY COMMITMENT OR OBLIGATION OF THE DEBTORS OR WILL CONFER UPON ANY PERSON ANY RIGHTS, BENEFITS OR REMEDIES OF ANY NATURE WHATSOEVER.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE CONFIRMATION OF THE PLAN WILL CREATE ANY IMPLICATION, UNDER ANY CIRCUMSTANCES, THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF OR THAT THE DEBTORS WILL BE UNDER ANY OBLIGATION TO UPDATE SUCH INFORMATION IN THE FUTURE.

THE PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE DEBTORS. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE AT THE TIME THEY WERE MADE, MAY NOT BE ACHIEVED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY MAY NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

18513698v1  0920630

# I.

## INTRODUCTION[1]

Zeiger Crane Rental, Inc. ("Zeiger"), Atlantic Leasing, Inc. ("Atlantic Leasing"), and Dyer Road Property, LLC ("Dyer Road" and, together with Zeiger and Atlantic Leasing, the "Debtors"), the Debtors-in-Possession in these Chapter 11 Cases, submit this Disclosure Statement (as amended, supplemented, or modified, the "Disclosure Statement") pursuant to section 1125 of the Code to holders of Claims against, and Equity Interests in, the Debtors in connection with (i) the solicitation of acceptances of the Debtors' Joint Plan of Reorganization dated May 23, 2011 (as amended, supplemented or otherwise modified, the "Plan"), filed by the Debtors with the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division (the "Court") and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled in accordance with the Disclosure Statement Order (hereinafter defined).

### A.     General

The Debtors each filed voluntary petitions for relief under Chapter 11 of the Code on February 18, 2011 (the "Petition Date"). Since that time, the Debtors have continued in the possession of their assets and in the management of their businesses as Debtors-in-possession pursuant to sections 1107 and 1108 of the Code.

Chapter 11 is the principal business reorganization chapter of the Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity security holders. In addition to permitting rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity security holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The confirmation of a Chapter 11 plan is the principal objective of a Chapter 11 case. A Chapter 11 plan sets forth the terms for satisfying claims against and interests in a debtor. Upon confirmation of a Chapter 11 plan, the plan is binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debts that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

---

[1] Unless otherwise defined in the Disclosure Statement, capitalized terms shall have the meanings ascribed to such terms in the Plan.

18513698v1  0920630

After a Chapter 11 plan has been filed, holders of certain claims against, or equity security holders in, a debtor are permitted to vote to accept or reject the plan. However, before soliciting acceptances of the proposed plan, section 1125 of the Code requires a debtor to prepare a disclosure statement in accordance with, and containing adequate information as defined in, section 1125 of the Code.

**B.    Disclosure Statement Overview**

Attached as exhibits to this Disclosure Statement are copies of the following:

- Exhibit A – The Plan;

- Exhibit B – Disclosure Statement Order;

- Exhibit C – Cash Flow Projections

- Exhibit D -- Chapter 7 Liquidation Analysis

- Exhibit E – Equipment List

- Exhibit F – Monthly Operating Reports (summary pages)

In addition, a Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims and Equity Interests that the Debtors believe are entitled to vote to accept or reject the Plan.

After notice and a hearing conducted by the Court on August 8, 2011, the Court entered an order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors and holders of equity interests to make an informed judgment whether to accept or reject the Plan, and establishing certain procedures with respect to the solicitation of votes to accept or reject the Plan (the "Disclosure Statement Order"). A copy of the Disclosure Statement Order is being delivered with this Disclosure Statement. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

**The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim or Equity Interest entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballot(s) in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Code.**

18513698v1  0920630

## C.   Holders of Claims and Equity Interests Entitled to Vote

Pursuant to the Code, only holders of allowed claims or allowed equity interests in classes of claims or equity interests that are impaired within the meaning of section 1124 of the Code that are entitled to receive distributions under a proposed Chapter 11 plan, are entitled to vote to accept or reject such plan.  Classes of claims or equity interests in which the holders of such claims or equity interests are unimpaired under a Chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.  Classes of claims or equity interests in which the holders of such claims or equity interests are impaired and are not entitled to receive any distributions under a proposed Chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

Under the Plan, Classes 2, 3, 4, 5, 8 and 9 are Impaired and, therefore, holders of Allowed Claims  in Classes 2, 3, 4, 5, 8 and 9 are entitled to vote on the Plan.  Classes 1, 6, 7 and 10 are Not Impaired (or Unimpaired) and, therefore, holders of Allowed Claims or Equity Interests in Classes 1, 6, 7 and 10 are deemed to have accepted the Plan.

## D.   Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you may receive separate Ballots which must be used for each separate Class of Claims.  Please vote and return your Ballot(s) to:

**IF BY MAIL OR**
**HAND- OR OVERNIGHT-DELIVERY:**

Office of the Clerk of the Court
United States Bankruptcy Court
1515 North Flagler Drive, Room 801
West Palm Beach, Florida 33401

DO NOT RETURN YOUR NOTES OR SECURITIES WITH YOUR BALLOT.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER.   ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN FOR PURPOSES OF TABULATING VOTES.

Any Claim in an Impaired Class as to which an objection or request for estimation is pending or which is scheduled by any of the Debtors as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Court temporarily allowing such Claim for the purpose of voting on the Plan.

If you are a holder of a Claim or Equity Interest entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions

18513698v1  0920630

concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact counsel for the Debtors at the address or phone number listed in Section 12.11 of the Plan.

**E.**  **Vote Required for Acceptance; Best Interests; Binding Effect**

The Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in amount of the equity interests of that class that actually casts ballots. The vote of a holder of a claim or equity interest may be disregarded if the Court determines, after notice and a hearing, that the acceptance or rejection was not solicited or procured in good faith.

In addition, section 1129 of the Code requires that a plan be accepted by each holder of a claim or equity interest in an impaired class or that the plan be found by the court to provide the holder with at least as much value on account of the claim or equity interest as it would receive if the Debtors were liquidated under Chapter 7 of the Code.

Confirmation of the Plan will make the Plan binding upon the Debtors, holders of Claims against, and Equity Interests in, the Debtors, and other parties in interest regardless of whether they have accepted the Plan, and, unless otherwise provided in the Plan, such holders of Claims and/or Equity Interests will be prohibited from receiving payment from, or seeking recourse against the Reorganized Debtors, their Property or any assets that are distributed to other holders of Claims and/or Equity Interests under the Plan. In addition, confirmation of the Plan will enjoin Creditors and Equity Interest holders from taking a wide variety of actions on account of a debt, claim, liability, interest or right that arose prior to the Confirmation Date. As of the Effective Date of the Plan, and unless otherwise provided in the Plan, Confirmation will also operate as a discharge of all Claims against, and Equity Interests in, the Debtors, to the fullest extent authorized by section 1141(d) of the Code.

**F.**  **Confirmation Hearing**

Pursuant to section 1128 of the Code, the Confirmation Hearing will be held in accordance with the Disclosure Statement Order before The Honorable Erik P. Kimball, United States Bankruptcy Judge, at the United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division, 1515 North Flagler Drive, Room 801, Courtroom B, West Palm Beach, Florida 33401. The Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received consistent with the Disclosure Statement Order. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or any adjourned Confirmation Hearing.

**G.**  **Effective Date**

The Plan may not be consummated immediately upon confirmation, but only upon the Effective Date. The Effective Date will not occur unless various conditions to confirmation and consummation are satisfied (or waived pursuant to, and in accordance with, the terms of the

18513698v1  0920630

Plan).  The Confirmation Order may be vacated if the conditions to the Effective Date are not timely met or waived.

Because of the conditions to the Effective Date provided in the Plan, a delay may occur between confirmation of the Plan and the Effective Date.  There is no assurance that the conditions to the Effective Date will be fulfilled, or that any condition that is not fulfilled will be waived.

## II.

## OVERVIEW OF DISTRIBUTIONS UNDER THE PLAN[2]

The following briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.

| Class | Type of Claim or Equity Interest | Estimated Amounts | Treatment | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | $0.00 | Unimpaired | 100% |
| 2 | People's Secured Claim | $8,800,000.00[3] | Impaired | 100% |
| 3 | FCC's Secured Claim | $3,500,000.00 | Impaired | 100% |
| 4 | Kelly's Secured Claim | $700,000.00 | Impaired | 100% |
| 5 | TCF's Secured Claim | $1,600,000.00 | Impaired | 100% |
| 6 | Ford Motor Credit's Secured Claim | $135,000.00 | Unimpaired | 100% |
| 7 | Palm Beach County's | Unknown | Unimpaired | 100% |

---

[2] This table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

[3] Subject to adjustment in accordance with the Settlement.

8

| Class | Type of Claim or Equity Interest | Estimated Amounts | Treatment | Estimated Recovery |
|-------|----------------------------------|-------------------|-----------|--------------------|
|       | Secured Claim |  |  |  |
| 8 | Allowed Other Secured Claims | $0.00 | Impaired | 100% |
| 9 | Allowed Unsecured Claims | $4,500,000.00 | Impaired | Unknown |
| 10 | Allowed Equity Interests | n/a | Unimpaired | 100% |

18513698v1  0920630

## III.

## GENERAL INFORMATION

**A.     Description and History of the Debtors**

      **1.     Organizational Structure and Background of the Debtors**

Zeiger was incorporated under the laws of the State of Florida in 1986 and has been operating continuously for the past twenty-five (25) years.  Atlantic Leasing was incorporated under the laws of the State of Florida in 1997.  Dyer Road was organized as a Florida limited liability company in 2005.  Steve Zeiger is the sole shareholder and director of Zeiger and Atlantic Leasing, and is the sole member and managing member of Dyer Road.

      **2.     Overview of the Debtors' Businesses and History**

      **(a)     Business Operations**

Zeiger is a nationwide crane rental company that has been operating out of Palm Beach County, Florida since 1986.  Zeiger currently has cranes rented in the States of Indiana, Louisiana and Florida.

Zeiger operates a fleet of Manitowoc and Link-Belt crawler cranes, all of which are 2004 or newer and hold annual and third party certifications.  Zeiger also operates a fleet of rough terrain cranes, hydraulic truck cranes, and all-terrain cranes.  Zeiger derives revenues from both bare equipment and manned rentals.  Equipment is rented on both short and long-term bases.  The equipment is owned by either Zeiger or Atlantic Leasing.

Dyer Road owns real estate situated at 4651 Dyer Boulevard, Riviera Beach, Florida, from which both Zeiger and Atlantic Leasing conduct their business operations.  Dyer Road also owns real estate situated at 7100 Military Trail, Riviera Beach, Florida, which is rented to an unrelated third-party.

      **(b)     Assets**

      **(i)     Equipment**

As of the Petition Date, Zeiger and/or Atlantic Leasing owned (a) thirteen (13) crawler cranes (150, 200, 230, 250, 275 and 300-ton), (b) eleven (11) hydraulic, all-terrain or rough-terrain cranes (15, 30, 50, 60, 65, 75, and 90-ton) (c) nineteen (19) trucks, (d) twenty-one (21) trailers, and (e) miscellaneous rigging and other equipment.  A full listing of the cranes, trucks and trailers is attached as Exhibit "E" to this Disclosure Statement.  The cranes range in age from 1 to 10 years old.  The equipment is in a "good to excellent" condition.  For the most part, Zeiger maintains an in-house servicing facility, but some repairs and maintenance are performed by outside servicers.

      **(ii)     Real Estate**

10

Dyer Road owns the following real estate:

(x)    Lot 1 is located at 7100 Military Trail, Riviera Beach, Florida 33407. Lot 1 is approximately 1.92 acres and contains a 6,400 square foot, single-story metal warehouse building. The warehouse building was originally built in 1954, but has been significantly renovated. Lot 1 is leased for $7,000.00 per month to an unrelated third party, who has a purchase option on Lot 1 for $1,500,000.00;

(y)    Lot 2 is a vacant, fenced and gated lot. Lot 2 is adjacent to Lot 1 and Lot 3 and is approximately 1 acre in size. The commercial tenant for Lot 1 has a purchase option on Lot 2 for $600,000.00; and

(z)    Lot 3 is located at 4651 Dyer Road, Riviera Beach, Florida 33407. Lot 3 is approximately 3 acres and contains a 10,328 square foot, 2-story concrete office and warehouse building. Zeiger's corporate headquarters are located and operated on Lot 3. The Debtors believe the value of Lot 3 is in excess of $2,000,000.00.

**(iii)    Real Estate Lease**

Dyer Road is party to a lease agreement with Airgas-South, Inc. for Lot 1. The lease is for a period of ten (10) years, together with two (2) renewal options for five (5) years each. The tenant is required to pay monthly rent in the amount of $7,000.00. The tenant is further obligated to pay all ad valorem and property taxes, maintain certain insurance, maintain the premises in good repair, and pay for utility charges relating to the property.

Under the lease, the tenant has rights of first refusal and options to purchase Lots 1 and 2 for a minimum price of $1,500,000.00 and $600,000.00, respectively.

**3.    Corporate Headquarters**

The Debtors' corporate headquarters are located in Palm Beach County, Florida and their principal operations are in Riviera Beach, Florida. The corporate headquarters are located on the property owned by Dyer Road.

**4.    Employees**

As of the Petition Date, the Debtors had a total of 38 employees, summarized as follows:

| **Employee Type** | **Count** |
|-------------------|-----------|
| Hourly Employees  | 29        |
| Salary Employees  | 9         |
| Total             | 38        |

**5.    Financing**

The approximate amount of secured debt owed by the Debtors as of the Petition Date was as follows:

11

| Lender | Amount of Debt |
|--------|----------------|
| People's | $21,100,000.00 |
| FCC | $3,500,000.00 |
| Kelly | $700,000.00 |
| TCF | $1,600,000.00 |
| Total Debt | $26,900,000.00 |

## B.    Events Leading to Bankruptcy

### 1.    General Events

The recent and prolonged economic crisis has particularly affected both the real estate market and construction industry in Florida, and the Debtors are not excepted from those who have suffered from this crisis. As a direct result of the crisis, construction starts were down and, therefore, demand for the Debtors' equipment had decreased and revenues have diminished.

Consequently, the Debtors defaulted under certain of their loans, and certain lenders commenced litigation in an effort to recover the collateral securing the loans. The Debtors efforts to resolve the loans through an out-of-court restructuring fell short and, consequently, the Debtors filed the Chapter 11 petitions in order to preserve the value of the Debtors' assets and to develop and implement a comprehensive restructuring plan.

### 2.    Litigation

On September 21, 2010, FCC filed suit in the Circuit Court in and for Palm Beach County against Zeiger, Atlantic Leasing and Steve Zeiger (Case Number 2010-CA-023819-XXXX-MB), seeking to replevin certain of the Debtors' assets, obtain a money judgment against Zeiger and Atlantic Leasing for breach of contract, and to enforce Steve Zeiger's personal guaranty. While this case was stayed as to the Debtors, the case remains pending as to Steve Zeiger, and FCC has moved for summary judgment. However, the parties agreed to a continuance of the summary judgment hearing in light of the parties' efforts to resolve matters on a consensual basis.

On February 4, 2011, Wells Fargo filed suit in the Circuit Court in and for Palm Beach County against Zeiger, Atlantic Leasing, Steve Zeiger and Nancy Zeiger (Case Number 50-2011-CA-XXXX-MB), seeking to replevin certain of the Debtors' assets, obtain a money judgment against Zeiger and Atlantic Leasing for breach of contract, and to enforce personal guarantees issued by Steve and Nancy Zeiger. Under the terms of a negotiated sale of Wells Fargo's collateral just prior to the Petition Date, the litigation was dismissed and all obligors were released by Wells Fargo. People's has sued Wells Fargo in an effort to obtain te amounts paid to Wells Fargo from the sale of collateral. People's alleges that People's held a first-priority lien against the collateral sold. Consequently, Wells Fargo has filed a contingent claim against the Debtors notwithstanding the release given to Zeiger and Atlantic Leasing.

On February 11, 2011, Ring Power Corporation ("Ring Power") filed suit in the Circuit Court in and for Duval County, Florida against Atlantic Leasing and Steve Zeiger (Case Number

18513698v1  0920630

16-2011-CA-001344-XXXX-MA), seeking to recover in excess of $35,552.40 allegedly due for the Debtors' failure to pay Ring Power for certain parts. Ring Power also sought to enforce a personal guaranty issued by Steve Zeiger. The case was voluntarily dismissed by Ring Power without prejudice.

On February 17, 2011, certain underwriters at Lloyd's of London ("Lloyds of London"), filed suit in the Circuit Court in and for Palm Beach County against Zeiger (Case Number 50-2011-CA-002640-XXXX—MB), seeking to recover in excess of $30,000.00 allegedly due to the Debtors' alleged failure to reimburse Lloyds of London for deductibles with respect to suits and claims defended and/or settled by Lloyds of London on behalf of Zeiger. The case was voluntarily dismissed by Lloyds of London after the commencement of the Debtors' Chapter 11 Cases.

## IV.

## EVENTS DURING THE CHAPTER 11 CASE

On February 18, 2011, the Debtors commenced the Chapter 11 Cases. The Debtors remain in possession of their assets as Debtors-in-Possession pursuant to sections 1107 and 1108 of the Code. The following is a brief description of the major events during the Chapter 11 Cases:

### 1.    "First Day" Motions

Shortly after commencing the Cases, the Debtors filed various "first day" motions with the Court, including, without limitation, the following: (i) *Application for Employment of Hinshaw & Culbertson, LLP, As Counsel for Debtors in Possession* (D.E. # 9); (ii) *Motion for Order (A) Authorizing, but not Requiring, the Debtors to Remit and Pay Sales, Use and Franchise Taxes and Certain Other Governmental Charges, and (B) Authorizing Financial Institutions to Receive, Process, Honor and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing* (D.E. #9); (iii) *Motion of the Debtors in Possession for an Order Authorizing the Debtors to Pay Pre-Petition Wages, Compensation and Employee Benefits Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code* (D.E. #12); (iv) *Motion of the Debtors in Possession for Authority to Use Cash Collateral and Request for Expedited Hearing* (D.E. # 18); (v) *Ex Parte Motion by Debtors for an Order Directing Joint Administration* (D.E. # 7); and (vi) *Motion for Order Authorizing Continued (A) Use of Existing Cash Management System, and (B) Use of Existing Business Forms* (D.E. #14). All first day motions were granted by the Court pursuant to the (i) *Final Order Authorizing Employment of Hinshaw & Culbertson, LLP as Counsel for Debtors-in-Possession, Nunc Pro Tunc to February 18, 2011* (D.E. #95); (ii) *Order Granting Debtors Motion for Order (A) Authorizing, but not Requiring, the Debtors to Remit and Pay Sales, Use and Franchise Taxes and Certain Other Governmental Charges, and (B) Authorizing Financial Institutions to Receive, Process, Honor and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing* (D.E. #51); (iii) *Order Granting Motion of the Debtors-in-Possession for Order Authorizing, but not Directing, the Debtors to Pay Prepetition Wages, Compensation and Employee Benefits Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code* (D.E. #58); (iv) *Order Granting Motion of Debtors in Possession For Authority to Use Cash Collateral and Request For Expedited Hearing* (D.E. # 49); (v) *Order*

18513698v1 0920630

*Granting Debtors' Ex Parte Motion for an Order Directing Joint Administration* (D.E. #17); and (vi) *Order Granting Motion for Order Authorizing Continued (A) Use of Existing Cash Management System, and (B) Use of Existing Business Forms* (D.E. #50).

**2.    Chief Restructuring Officer**

On March 17, 2011, the Debtors filed the *Application to Retain Morris Anderson & Associates, Ltd. as Chief Restructuring Officer Nunc Pro Tunc to February 18, 2011* (D.E. #71), pursuant to which the Debtors sought to retain Morris Anderson & Associates, Ltd. and designate Mark J. Welch as chief restructuring officer. Following hearings conducted before the Court on May 19, 2011, the Court approved the foregoing application. On May 24, 2011, the Court entered its *Order Granting Application to Retain Morris Anderson & Associates, Ltd. as Chief Restructuring Officer Nunc Pro Tunc to February 18, 2011* (D.E. # 174). The Court approved the Debtors' request and Mark J. Welch has since served as the Debtors' chief restructuring officer in these Cases.

**3.    Cash Collateral Use**

On February 21, 2011, the Debtors filed their *Emergency Motion of the Debtors for Authority to Use Cash Collateral and Request for Expedited Hearing* (D.E. # 11). The Court has entered the following orders on cash collateral:

(a)    On March 4, 2011, the Court entered the *Interim Order Authorizing Use of Cash Collateral and Setting Final Hearing* (D.E. # 49);

(b)    On March 22, 2011, the Court entered the *Second Interim Order Authorizing Use of Cash Collateral* (D.E. #96);

(c)    On April 7, 2011, the Court entered the *Third Interim Order Authorizing Use of Cash Collateral* (D.E. #132); and

On May 3, 2011, the Court entered the *Final Order Authorizing Use of Cash Collateral* (D.E. # 158), pursuant to which the Debtors are authorized to use cash collateral through the effective date of the Plan. A status conference on cash collateral was conducted by the Court on May 19, 2011.

**4.    Motion to Appointment Chapter 11 Trustee and Settlement with People's**

On February 25, 2011, shortly after the commencement of the Debtors' Chapter 11 Cases, People's filed suit in the United States District Court for the Southern District of Texas against Steve Zeiger, the B&Z Steel Erection Company, Inc., and Zeiger Investments, Inc. (the B&Z Steel Erection Company, Inc. and Zeiger Investments, Inc. shall be collectively referred to as the "Related Entities")(Case Number H-11-677), based upon the Debtors' default on their obligations to People's and Steve Zeiger's and the Related Entities' guaranties of those obligations.

On March 18, 2011, People's United Equipment Finance Corp. filed its *Motion to Appoint Chapter 11 Trustee* (the "Trustee Motion") (D.E. #80). In the Trustee Motion, People's

14

alleged that the Debtors transferred funds to Steve Zeiger and related parties and unlawfully disposed of equipment subject to liens of secured creditors. In the event the Trustee Motion had been tried, the Debtors would have presented evidence that Steve Zeiger had on numerous occasions infused cash into the Debtors to keep them operating as going concerns, and were in any event in excess of transfers received by Steve Zeiger and third parties. Moreover, the Debtors believed that the Trustee Motion ignored other facts that placed the transactions complained of into a far different context. Prior to the evidentiary hearing on the Trustee Motion, the Debtors and People's entered into a comprehensive settlement agreement (the "Settlement") that resolved numerous of the disputes between them. On April 4, 2011, the Debtors filed their *Motion to Approve Stipulation with People's United Equipment Finance Corp. Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure* (the "Settlement Motion") (D.E. #119). A summary of the Settlement is as follows[4]:

(a)     The allowed amount of Peoples' claim shall be $21,189,130.83, together with interest and attorneys' fees and costs (the "Claim Amount"). The Claim Amount excludes any prepayment penalties or premiums; provided, however, in the event of a default by the Debtors, $1,000,000.00 shall be added to the Claim Amount;

(b)     The Debtors shall surrender the "Surrendered Equipment," which shall then be sold at public or private sale(s), the process of which has been agreed to by the parties, and the net proceeds received shall be credited against the Claim Amount;

(c)     The Debtors shall surrender and otherwise transfer the "Rented Equipment," consisting of five (5) cranes and miscellaneous trucks, trailers and rigging equipment, to People's in exchange for a credit against the Claim Amount in the amount of $5,200,000.00;

(d)     People's shall rent the "Rented Equipment" to the Debtors for an agreed rental consistent with the Stipulation;

(e)     The Debtors consent to relief from stay in favor of People's for purposes of commencing a foreclosure action against the real estate owned by Dyer Road Property, LLC. The parties shall enter into a stipulation, whereby the Debtors shall have until the date which is ten (10) days prior to the scheduled foreclosure sale – not to occur until at least June 12, 2012 – to redeem the real estate for the then fair market value. The redemption price shall be a credit against the Claim Amount. If not redeemed, the property may be sold at a foreclosure sale, with the net proceeds to be applied against the Claim Amount;

(f)     People's agrees to forbear from pursuing Mr. Steve Zeiger on account of any personal guaranty through and including the real estate redemption date; provided, however, Mr. Zeiger consents to the entry of an agreed judgment equal to the Claim Amount, subject to reduction for any and all amounts received from the sale of collateral as a credit against the Claim Amount;

(g)     Commencing on June 1, 2011 and through the Effective Date of the Plan, the Debtors shall pay People's a monthly payment equal to $65,000.00. Thereafter, commencing on

---

[4] The terms and conditions of the Settlement are attached as Exhibit "A" to the Plan.

the Effective Date of the Debtors' Plan, the Debtors shall make monthly payments to People's in the amount of (i) $30,104 – equal to the regular mortgage payment in connection with the mortgage on the real estate owned by Dyer Road Property, LLC, plus (ii) the excess of the Claim Amount then outstanding over the principal amount outstanding on the mortgage, amortized over five (5) years with interest. While the remaining Claim Amount shall be so amortized and paid by the Debtors, People's will be able to pursue Mr. Zeiger on his personal guarantee for any portion of the Claim Amount outstanding from and after the expiration of the agreed forbearance period;

(h)    The Debtors shall have one hundred and twenty days (120) to obtain confirmation of their plan of reorganization;

(i)    The parties agree to continue the hearings on the Injunction Motion and Trustee Motion until the earlier to occur of final approval of the Stipulation, denial of approval (in which case the Stipulation shall be deemed null and void) and thirty five (35) days following execution of the Stipulation.    Upon final approval of the Stipulation, the Injunction Motion shall be withdrawn with prejudice as it relates to People's and the Trustee Motion shall be withdrawn without prejudice and;

(j)    Pending approval of the Stipulation, People's consents to the Debtors' further use of cash collateral and further consents to a professional fee reserve in the amount of $50,000.00 per month or $12,500.00 per week for payment of awarded professional fees subject, however, to the rights of People's to object to any fees.    In the event the parties' obtain final approval of the Stipulation, People's consents to the Debtors' use of cash collateral on a final basis.

On April 21, 2011, the Court conducted a hearing on the Settlement Motion and Settlement and, on May 3, 2011, the Court entered the *Order Granting Debtors' Motion to Approve Stipulation with People's United Equipment Finance Corp. Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure* (the "Settlement Order") (D.E. # 157).    The Settlement Order became final and non-appealable on May 17, 2011.

### 5.    Retention of Appraisers

On March 17, 2011, the Debtors filed their:    (1) *Emergency Application for Order Authorizing Employment of David Fiegel and Blackbird Asset Services, LLC, as Appraiser, Nunc Pro Tunc to March 14, 2011* (D.E. #68), for purposes of appraising the Debtors' equipment, and (2) *Emergency Application for Order Authorizing Employment of Stephen D. Shaw and Callaway & Price, Inc., as Appraiser, Nunc Pro Tunc to March 16, 2011* (D.E. #69), for purposes of appraising Dyer Road's real estate.    The foregoing applications were granted by orders of the Court (D.E.#s 150 and 151, respectively).

### 6.    Plan Deadline and Claims Deadline Order

On March 18, 2011, the Court entered its *Order Shortening Time for Filing Proofs of Claim, Establishing Plan and Disclosure Statement Filing Deadlines, and Addressing Related Matters* (the "Procedures Order") (D.E. #83).    Pursuant to the Procedures Order, the deadline to file a proof of claim in the Cases was shortened to May 19, 2011.    The deadline to file a plan was set for August 17, 2011.

16

7.    **Section 105 Injunction Adversary Proceeding**

On March 17, 2011, the Debtors filed an adversary complaint in the United States Bankruptcy Court for the Southern District of Florida, case number 11-1814-BKC-EPK (the "Adversary Proceeding"), styled *Zeiger Crane Rentals, Inc. v. People's United Equipment Finance, Inc., Caterpillar Financial Services Corporation, and Ring Power Corporation*. The lawsuit sought the issuance of temporary and permanent injunctions against People's, FCC and Ring Power Corporation ("Ring Power") to enjoin those entities from continuing with litigation on guarantees against the Debtors' principal, Steve Zeiger. Also on March 17, 2011, the Debtors filed their *Emergency Motion for Temporary Restraining Order and for Preliminary Injunction* (the "Injunction Motion") (D.E. #2 in the Adversary Proceeding).

As a result of the Settlement with People's, the Adversary Proceeding was dismissed with prejudice against People's on June 23, 2011. Ring Power voluntarily dismissed the pre-petition litigation and, therefore, the Debtors voluntarily dismissed the claims asserted against Ring Power in the Adversary Proceeding on April 28, 2011. The Adversary Proceeding remains pending against FCC. However, on July 13, 2011, the Debtors filed their *Motion to Approve Settlement Agreement With Caterpillar Financial Services Corporation Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure* (the "FCC Settlement) (D.E. #203). The FCC Settlement is scheduled for hearing before the Court on August 8, 2011. If the FCC Settlement is approved, the Adversary Proceeding will be dismissed with prejudice against FCC.

8.    **Settlement With Caterpillar Financial Services, Inc.**

As noted above, the Debtors have settled with Caterpillar Financial Services, Inc. d/b/a FCC. The FCC Settlement provides as follows:

(a)    FCC shall have an Allowed Secured Claim in the amount of $3,500,000.00, secured by a first priority lien against the FCC collateral;

(b)    The remainder of the FCC Claim in the amount of $1,799,150.34 shall be treated as an Unsecured Claim in the Cases; provided, however, FCC has agreed to reduce the claim to $1,200,000.00 with respect to Mr. Steve Zeiger in connection with his personal guaranty;

(c)    Mr. Zeiger shall consent to the entry of a judgment in the amount of $1,200,000.00 in favor of FCC, which shall accrue interest at the rate of six percent (6%) per annum. FCC agrees to a three (3) year forbearance with respect to the consent judgment;

(d)    FCC shall be entitle to adequate protection through confirmation in the amount of $7,500.00 per month retroactive to June 1, 2011; and

(e)    Upon approval of the FCC Settlement, the Adversary Proceeding shall be dismissed with prejudice and the non-bankruptcy litigation pending against Mr. Zeiger and certain of the Debtors shall be dismissed without prejudice.

9.    **Monthly Operating Reports/U.S. Trustee Fees**

18513698v1 0920630

The Debtors have prepared and filed all monthly operating reports required pursuant to the Operating Guidelines for Possession-in-Possession and paid all fees pursuant to 28 U.S.C. § 1930(a)(6). Copies of the monthly operating reports have been filed with the Court and are available for review. Copies of the summary pages are attached to this Disclosure Statement as Exhibit "F." The Debtors believe they are current on fees owed pursuant to 28 U.S.C. § 1930(a)(6).

**V.**

**THE PLAN OF REORGANIZATION**

### A.     Overview of Plan

**THE PLAN IS ANNEXED HERETO AS <u>EXHIBIT A</u> AND IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT. THE SUMMARY OF THE PLAN SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PROVISIONS OF THE PLAN AND THE SUMMARY CONTAINED HEREIN, THE TERMS OF THE PLAN WILL GOVERN.**

### B.     Classification and Treatment of Claims Against The Debtors

The Plan classifies Claims and Equity Interests separately and provides different treatment for different Classes of Claims and Equity Interests in accordance with the Code. As described more fully below, the Plan provides, separately for each Class, that holders of certain Claims will receive various amounts and types of consideration based on the different rights of the holders of Claims in each Class.

### C.     Unclassified Claims

#### 1.     Allowed Administrative Claims.

Administrative Claims are Claims constituting a cost or expense of the administration of the Cases allowed under sections 503(b) and 507(a)(2) of the Code. Such Claims include any actual and necessary costs and expenses of preserving the Estates of the Debtors, any actual and necessary costs and expenses of operating the businesses of the Debtors in Possession, any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the conduct of their businesses, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all compensation and reimbursement of expenses to the extent allowed by the Court under section 330, 331 or 503 of the Code, all costs associated with the cure of any executory contracts and unexpired leases between the Debtors and any Person, and any fees or charges assessed against the Estates of the Debtors under section 1930 of title 28 of the United States Code.

Except as otherwise provided herein, and except to the extent that any entity entitled to payment of any Allowed Administrative Claim agrees to a different treatment, each holder of an Allowed Administrative Claim shall receive Cash in an amount equal to such Allowed Administrative Claim on the later of the Effective Date and the date such Administrative Claim

18513698v1  0920630

becomes an Allowed Administrative Claim by Final Order, or as soon thereafter as is reasonably practicable. Allowed Administrative Claims shall be paid from the Debtors' Cash on hand.

### a.    Ordinary Course Claims

Allowed Administrative Claims representing liabilities incurred by the Debtors in Possession in the ordinary course of their businesses shall be (a) paid in full and performed in the ordinary course of business consistent with past practices and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions, or (b) paid in full in Cash on the later of the Effective Date of the Plan or the date on which such Claim becomes an Allowed Administrative Claim by Final Order of the Court.

### b.    Professional Fee and Expense Claims

Compensation of Professionals and reimbursement of expenses incurred by Professionals are Administrative Claims pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5) of the Code (the "Professional Fee and Expense Claims"). All payments to Professionals for Professional Fee and Expense Claims will be made in accordance with the procedures established by the Code, the Rules and the Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses. The Court will review and determine all applications for compensation for services rendered and reimbursement of expenses.

All entities seeking an award by the Court of Professional Fee and Expense Claims shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date pursuant to section 330 of the Code and Rule 2016 by the date fixed by the Court.

The time for filing objections to applications for allowance and payment of Professional Fee and Expense Claims, and the date and time for a hearing in respect of such applications and the related objections, if any, shall be set by order of the Court.

All allowed Professional Fee and Expense Claims shall be paid in full in Cash on the Effective Date.

The Debtors estimate that Professional Fee and Expense Claims through Confirmation (net of carve outs) will be as follows: (a) Hinshaw & Culbertson, LLP - $155,992.59, and (b) MorrisAnderson, LLP - $190,000.00.

### 2.    Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim under section 507(a)(8) of the Code has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall be paid in full in Cash on the later of the Effective Date of the Plan or the date on which such Claim becomes an Allowed Priority Tax Claim by Final Order of the Court.

### 3.    United States Trustee's Fees

The Debtors shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) through Confirmation on the Effective Date.  The Reorganized Debtors shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) for post-confirmation periods within the time periods set forth in 28 U.S.C. §1930(a)(6), until the earlier of the closing of these Cases by the issuance of a Final Decree by the Court, upon the entry of an order of this Court dismissing these Cases, or upon entry of an order converting this Case to another chapter under the Code, and the Reorganized Debtors shall provide to the United States Trustee upon the payment of each post-confirmation payment an appropriate post-confirmation operating report indicating disbursement for the relevant periods.

## D.    Classified Claims

For purposes of this Plan, Claims against, and Equity Interests in, the Debtors shall be classified and treated as follows:

### 1.    Class 1. Allowed Other Priority Claims

(a)    Description.  Class 1 consists of the Allowed Other Priority Claims which are entitled to priority in accordance with section 507(a) of the Code (other than Administrative Claims and Priority Tax Claims).

(b)    Treatment.  Each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, release and exchange for such Claim, Cash in an amount equal to the amount of such Allowed Other Priority Claim in accordance with section 1129(a)(9) of the Code on the later of the Effective Date or the date such Claim becomes an Allowed Class 1 Claim, or as soon thereafter as is reasonably practicable.

(c)    Impairment.  The Class 1 Claim is Unimpaired.

### 2.    Class 2. Allowed Secured Claim of People's

(a)    Description. Class 2 consists of the Allowed Secured Claim held by People's.

(b)    Treatment. The Allowed Class 2 Claim shall be treated as follows:

(i)    The terms and conditions of the Settlement attached to this Plan as Exhibit "A" are incorporated in their entirety by reference.  In the event of any inconsistency between the Settlement and the Plan, the Settlement shall prevail;

(ii)    Commencing on the Effective Date of the Plan, People's shall be paid monthly payments equal to the sum of (the "Initial Class 2 Payment"): (x) $30,104.00, plus (y) an additional amount calculated by amortizing the difference between the Allowed Claim of People's (as of the Effective Date) and the amount outstanding as of the Effective Date of the Plan on the promissory note secured by a mortgage on real property owned by Dyer Road at 4651 Dyer Boulevard, Riviera Beach, Florida 33407 (the "Real Estate") based on a sixty (60) month amortization using an interest rate of eight and one-half percent (8.5%) per annum.  The

20

Initial Class 2 Payment shall continue until the Real Estate is redeemed or sold consistent with the terms and conditions of the Settlement; and

(iii)    Commencing in the month following disposition of the Real Estate consistent with the terms and conditions of the Settlement, the Initial Class 2 Payment shall be recalculated to an amount equal to the value of the accounts receivable and other Collateral securing the Allowed Class 2 Claim (determined as of the Effective Date) based on a sixty (60) month amortization using an interest rate of eight and one-half percent (8.5%) per annum (the "Recalculated Class 2 Payment"). The Recalculated Class 2 Payment shall continue for the number of months remaining on the initial sixty (60) month amortization; and

(iv)    The amount of the Allowed Claim of Peoples as of the Effective Date, less the value received by People's for the Real Estate, less the value of the accounts receivable and other Collateral (other than the cranes surrendered or transferred to People's under the Settlement) securing the Allowed Class 2 Claim (valued as of the Effective Date), less the value received by People's for any other Collateral securing the Allowed Class 2 Claim, shall be an Allowed Class 9 Claim; and

(v)    People's shall refrain from taking any action against any guarantor of the Allowed Claim of People's until the first to occur of (x) a Termination Event as defined under the Settlement, or (y) the redemption or sale of the Real Estate consistent with the Settlement; and

(vi)    People's shall retain its Lien against all Collateral against which People's held a lien as of the Petition Date (unless otherwise disposed of in the ordinary course or consistent with the Settlement) in order to secure the Allowed Class 2 Claim.

(c)    Impairment. The Class 2 Claim is Impaired.

3.    **Class 3. Allowed Secured Claim of FCC**

(a)    Description. Class 3 consists of the Allowed Secured Claim of FCC.

(b)    Treatment. The Allowed Class 3 Claim shall be treated as follows:

(i)    The Allowed Amount of the Class 3 Claim shall be Three Million Five Hundred Thousand Dollars ($3,500,000.00). Commencing thirty (30) days following the Effective Date of the Plan, the holder of the Allowed Class 3 Claim shall be paid twelve (12) equal monthly payments of interest only calculated using an interest rate of seven percent (7%) per annum. Commencing in the fourteenth (14th) month following the Effective Date of the Plan, the holder of the Allowed Class 3 Claim shall be paid seventy-two (72) equal monthly payments of principal and interest based on a seventy-two (72) month amortization calculated using an interest rate of seven percent (7%) per annum. The holder of the Allowed Class 3 Claim shall retain its first-priority Lien against the collateral listed on Exhibit "B" to this Plan; and

(ii)    The difference between the Allowed Claim of FCC and the Allowed Class 3 Claim shall be treated as an Allowed Class 9 Claim.

(c)    Impairment. The Allowed Class 3 Claim is Impaired.

21

18513698v1 0920630

4.    **Class 4. Allowed Secured Claim of Kelly**

(a)    <u>Description.</u> Class 4 consists of Allowed Secured Claim of Kelly.

(b)    <u>Treatment.</u> The Allowed Class 4 Claim shall be treated as follows:

(i)    The Allowed Amount of the Class 4 Claim shall be Seven Hundred Thousand Dollars ($700,000.00). Commencing thirty (30) days following the Effective Date of the Plan, the holder of the Allowed Class 4 Claim shall be paid twelve (12) equal monthly payments of interest only calculated using an interest rate of seven percent (7%) per annum. Commencing in the fourteenth (14th) month following the Effective Date of the Plan, the holder of the Allowed Class 4 Claim shall be paid seventy-two (72) equal monthly payments of principal and interests based on a seventy-two (72) month amortization calculated using an interest rate of seven percent (7%) per annum. The holder of the Allowed Class 4 Claim shall retain its first-priority Lien against the collateral listed on Exhibit "B" to this Plan; and

(ii)    The difference between the Allowed Claim of Kelly and the Allowed Class 4 Claim shall be treated as an Allowed Class 9 Claim.

(c)    <u>Impairment</u>. The Class 4 Claim is Impaired.

5.    **Class 5. Allowed Secured Claim of TCF**

(a)    <u>Description.</u> Class 5 consists of Allowed Secured Claim of TCF.

(b)    <u>Treatment.</u> The Allowed Class 5 Claim shall be treated as follows:

(i)    The Allowed Amount of the Class 5 Claim shall be One Million Six Hundred Thousand Dollars ($1,600,000.00). Commencing thirty (30) days following the Effective Date of the Plan, the holder of the Allowed Class 5 Claim shall be paid twelve (12) equal monthly payments of interest only calculated using an interest rate of seven percent (7%) per annum. Commencing in the fourteenth (14th) month following the Effective Date of the Plan, the holder of the Allowed Class 5 Claim shall be paid seventy-two (72) equal monthly payments of principal and interest based on a seventy-two (72) month amortization calculated using an interest rate of seven percent (7%) per annum. The holder of the Allowed Class 5 Claim shall retain its first-priority Lien against the collateral listed on Exhibit "B" to this Plan; and

(ii)    The difference between the Allowed Claim of TCF and the Allowed Class 5 Claim shall be treated as an Allowed Class 9 Claim.

(c)    <u>Impairment</u>.    The Class 5 Claim is Impaired.

6.    **Allowed Secured Claim of Ford Motor Credit**

(a)    <u>Description.</u> Class 6 consists of the Allowed Secured Claim of Ford Motor Credit Company, LLC.

(b)    <u>Treatment.</u> The holder of the Allowed Class 6 Claim shall be treated as follows:

18513698v1 0920630

(i)    The holder of the Allowed Class 6 Claim shall be paid in the ordinary course of business by the Reorganized Debtors.  The Reorganized Debtors shall assume the indebtedness owed to the holder of the Allowed Class 6 Claim, and such holder shall continue to be paid total monthly payments of principal and interest in the amount of $5,129.63 per month in accordance with the terms and conditions of the financing agreements entered by the parties; and

(ii)    The holder of the Allowed Class 6 Claim shall retain its first-priority Lien against the Collateral identified on Exhibit "B" to this Plan

(c)    Impairment.  The Class 6 Claim is Unimpaired.

**7.    Class 7. Allowed  Secured Claim of Palm Beach County**

(a)    Description.  Class 7 consists of Allowed Secured Claim of Palm Beach County for 2011 ad valorem taxes.  These taxes are secured by a first priority Lien against Dyer Road's real property in accordance with applicable Florida law.

(b)    Treatment.  After the 2011 ad valorem taxes are calculated and the tax bill provided to the Debtors, the Allowed Class 6 Claim shall be paid in the ordinary course of business no later than March 31, 2012.

(c)    Impairment.  The Class 7 Claim is Unimpaired.

**8.    Class 8. Allowed Other Secured Claims**

(a)    Description.  Class 8 consists of Allowed Other Secured Claims, other than the Allowed Class 2 through 7 Claims.

(b)    Treatment.  The holders of Allowed Other Secured Claims shall be satisfied, to the extent the Collateral securing such Other Secured Claim has not been previously sold or abandoned, as follows:  (i) the holder shall retain the Lien securing such Other Secured Claim, and such holder shall receive deferred cash payments totaling at least the allowed amount of such Other Secured Claim, of a value, as of the Effective Date, consistent with 11 U.S.C. §§ 506(b) and 1129(b)(2)(A)(i); (ii) from the Collateral securing each such Claim in full satisfaction, release and discharge of such Claim in accordance with 11 U.S.C. § 1129(b)(2)(A)(ii); (iii) the indubitable equivalent of such Other Secured Claim in accordance with 11 U.S.C. § 1129(b)(2)(A)(iii); or (iv) as otherwise authorized by the Code or agreed to by the holder of such Claim and the Reorganized Debtors.

(c)    Impairment.  The Class 8 Claim is Impaired.

**9.    Class 9. Allowed Unsecured Claims**

(a)    Description.  Class 9 consists of Allowed Unsecured Claims.

(b)    Treatment.  Commencing sixty (60) days following the Effective Date of the Plan, or as soon thereafter as is reasonably practicable, each holder of an Allowed Class 15 Claim shall receive such holder's Pro Rata share of Distributions of Net Proceeds of Actions.

18513698v1  0920630

Notwithstanding anything herein to the contrary, the Debtors will seek approval of a resolution of any and all Avoidance Actions against Mr. Steve Zeiger, including, without limitation, any party, including his family members, who received payments from the Debtors to or for the benefit of Steve Zeiger (the "S. Zeiger Avoidance Action Resolution").  Approval of the S. Zeiger Avoidance Action Resolution (discussed more fully in Section 9.12 of the Plan) shall be subject to (a) the entry of a Confirmation Order, (b) the Effective Date of the Plan, and (c) Class 9 voting to support the Plan.  If the S. Zeiger Avoidance Action Resolution is approved, then commencing in the thirteenth (13th) month following the Effective Date of the Plan, and each month thereafter for a period of sixty (60) months, Mr. Zeiger shall pay $2,500.00 (the "S. Zeiger Contribution") to Zeiger Crane Rental, Inc. for purposes of distributing the S. Zeiger Contributions to the holders of the Zeiger Distributable Claims.  The total amount of S. Zeiger Contributions to be distributed will be $150,000.00.  If the S. Zeiger Avoidance Action Resolution is approved, Mr. Zeiger will subordinate any Claims he may possess against the Debtors and Reorganized Debtors pending satisfaction of the S. Zeiger Contributions.  The Plan will represent a request to approve the S. Zeiger Avoidance Action Resolution under Rule 9019 of the Bankruptcy Rules.

(c)    Impairment.  The Class 9 Claim is Impaired.

**10.    Class 10. Allowed Equity Interests[5]**

(a)    Description.  Class 10 consists of Allowed Equity Interests.  Equity Interests consist of any membership interest, share of preferred stock, common stock or other instrument evidencing an ownership interest in the Debtors, whether or not transferrable, and any option, warrant or right, contractual or otherwise, to acquire any such interest.

(b)    Treatment.  Holders of Allowed Equity Interests shall retain their Equity Interests under the Plan.

(c)    Impairment.  The Class 10 Claims are Unimpaired.

**E.    Provisions Regarding Voting and Distributions Under the Plan and Treatment of Disputed, Contingent and Unliquidated Claims and Interests[6]**

**1.    Voting of Claims and Interests**

Each holder of an Allowed Claim or Equity Interest in an Impaired Class of Claims or Equity Interests that is entitled to vote on the Plan pursuant to the Code shall be entitled to vote

---

[5] Other than payment of salary and related benefits approved by the Court, the holder of the Allowed Class 10 Claim has not received any dividends or other distributions on account of any Equity Interest.  During the Cases, Mr. Steve Zeiger has been paid $5,000.00 per week salary, as previously approved by the Court.  Mr. Zeiger filed a proof of claim against the Debtors in the amount of $2,058,800.00 (Claim No. 31) representing unsecured amounts advanced to or for the benefit of the Debtors.

[6] The provisions of Sections VE2 and VE4 through VE12 are subject to the provisions of the Settlement with respect to People's.

18513698v1 0920630

separately to accept or reject the Plan as provided in such order as may be entered by the Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Court.

### 2.    Nonconsensual Confirmation ("Cramdown")

Notwithstanding that any Impaired Class of Claims or Equity Interests entitled to vote does not accept the Plan by the statutory majorities required by section 1126(c) of the Code, the Debtors are requesting confirmation of the Plan under the cram down provisions of section 1129(b) of the Code.

### 3.    Method of Distribution Under the Plan

(a)      Subject to Rule 9010, and except as otherwise provided in this Section 5.03 of the Plan, all Distributions under the Plan shall be made by the Disbursing Agent to the holder of each Allowed Claim at the address of such holder as listed on the Schedules unless the Debtors or the Disbursing Agent have been notified in writing of a change of address, including by the filing of a proof of Claim by such holder that provides an address different from the address reflected on the Schedules.

(b)      Any payment of Cash made pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer.

(c)      Any payment or Distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(d)      No payment of Cash less than one hundred dollars ($100.00) shall be made to any holder of a Claim unless a request therefor is made in writing to the Disbursing Agent or unless the Distribution is a final Distribution.

(e)      When any Distribution on account of an Allowed Claim pursuant to the Plan would otherwise result in a Distribution that is not a whole number, the actual Distribution shall be rounded as follows: (i) fractions of ½ or greater shall be rounded to the next higher whole number, and (ii) fractions of less than ½ shall be rounded to the next lower whole number.  Cash to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided in Section 6.03(e) of the Plan.

(f)      Any Distributions of Cash or other property under the Plan which are unclaimed for a period of six (6) months after the Distribution Date shall be vested in the Reorganized Debtors and any entitlement of any holder of any Claim to such Distributions shall be extinguished and forever barred.

(g)      At the close of business on the Effective Date, the claims register shall be closed, and there shall be no further changes in the record holders of any Claims.  The Disbursing Agent shall have no obligation to recognize any transfer of any Claims occurring after the Effective Date; provided, however, that the foregoing will not be deemed to prohibit the sale or transfer of any Claim subsequent to the Effective Date and prior to the Effective Date.  The Disbursing

18513698v1  0920630

Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders as of the close of business on the Effective Date.

4.    **Distributions Withheld for Disputed General Unsecured Claims**

(a)    Establishment and Maintenance of Reserve

On any Distribution Date, the Disbursing Agent shall reserve from the Distributions to be made on such dates to the holders of Allowed Claims, an amount equal to one-hundred percent (100%) of the Distributions to which holders of Disputed Claims would be entitled under the Plan as of such dates if such Disputed Claims were Allowed Claims in their Disputed Claim Amounts or as estimated by the Debtors or the Court in accordance with Section 6.09 of the Plan (the "Disputed Claims Reserve").

(b)    Property Held in Disputed Claims Reserve

Cash in the Disputed Claims Reserve shall (together with all other accretions or distributions thereon) be held in trust by the Disbursing Agent for the benefit of the potential recipients of such Cash and shall not constitute property of the Debtors or the Reorganized Debtors.

(c)    Distributions Upon Allowance of Disputed General Unsecured Claims

The holder of a Disputed Claim that becomes an Allowed Claim subsequent to any Distribution Date shall receive Distributions of Cash and any other consideration from the Disputed Claims Reserve from the Disbursing Agent within ten (10) days following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order.  Such Distributions shall be made in accordance with the Plan.

(d)    No Surplus Distributions to Holders of Allowed General Unsecured Claims.

To the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim, the excess of Cash and any other consideration in the Disputed Claims Reserve over the amount of Cash and any other consideration actually distributed on account of such Disputed Claim shall vest in the Reorganized Debtors.

(e)    Expenses of Disputed Claims Reserve

Except as otherwise ordered by the Court, the amount of any reasonable expenses incurred by the Disbursing Agent on or after the Effective Date with respect to the Disputed Claims Reserve shall be paid by the Disbursing Agent.

5.    **Procedures for Allowance or Disallowance of Disputed Claims**

(a)    Objections to and Resolution of Administrative Claims and Claims

Except as to applications for allowance of compensation and reimbursement of expenses under sections 330 and 503 of the Code, the Debtors or the Reorganized Debtors, as the case

18513698v1 0920630

may be, shall have the exclusive right to make and file objections to Administrative Claims and Claims subsequent to the Effective Date. All objections shall be litigated to Final Order, if necessary. The Debtors or the Reorganized Debtors, as the case may be, shall have the authority to compromise, settle, otherwise resolve or withdraw any of their objections without approval of the Court, except as otherwise provided herein. Unless otherwise ordered by the Court, the Debtors or the Reorganized Debtors, as the case may be, shall file all objections to Claims and serve such objections upon the holder of the Claim as to which the objection is made as soon as is practicable, but in no event later than one hundred twenty (120) days after the Effective Date or such later date as may be approved by the Court. The Debtors and the Reorganized Debtors reserve the right to object to Administrative Claims as such claims arise in the ordinary course of business. The Reorganized Debtors shall bear all costs and expenses relating to the investigation and prosecution of Disputed Claims from and after the Effective Date.

      (b)    No Distribution Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim is disputed, the full amount of such Claim shall be treated as a Disputed Claim for purposes of this Plan, and no payment or Distribution provided under the Plan shall be made on account of such unless and until such Disputed Claim becomes an Allowed Claim (in whole or in part).

      (c)    Disallowed Claims

All Claims or Equity Interests held by Persons against whom the Debtors or the Reorganized Debtors has commenced an Action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Code, shall be deemed "disallowed" Claims or Equity Interests pursuant to section 502(d) of the Code and holders of such Claims or Equity Interests shall not be entitled to vote to accept or reject the Plan. Claims or Equity Interests that are deemed disallowed pursuant to this Section 5.05(c) of the Plan shall continue to be disallowed for all purposes until the Action against such party has been settled or resolved by Final Order and any sums due to the Estate from such party have been paid.

    **6.**    **Disbursing Agent**

The Reorganized Debtors shall act as Disbursing Agent under the Plan with respect to all Distributions on account of Allowed Claims, which shall be distributed from the account of Zeiger Crane Rental, Inc. Any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by the Plan. Each Disbursing Agent will serve without bond. The Disbursing Agent shall hold all reserves and accounts pursuant to the Plan, including the Disputed Claims Reserve.

    **7.**    **Setoffs and Recoupment**

The Debtors may, but shall not be required to, set off (pursuant to the provisions of sections 553 and 362 of the Code or other applicable law) against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any setoff or recoupment right they may have against the holder of such Claim.

18513698v1  0920630

8.    **Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

9.    **Estimations of Claims**

For purposes of calculating and making Distributions under the Plan, the Reorganized Debtors shall be entitled to estimate, in good faith and with due regard to litigation risks associated with Disputed Claims, the maximum dollar amount of Allowed and Disputed Claims, inclusive of contingent and/or unliquidated Claims in a particular Class. The Reorganized Debtors may at any time request that the Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Code or otherwise regardless of whether the Debtors previously objected to such Claim or whether the Court has ruled on any such objection, and the Court will retain jurisdiction to estimate any Claim at any time during litigation concerning such objection to any Claim, including without limitation, during the pendency of any appeal relating to any such objection. In the event that the Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute either the Allowed Amount of such Claim or a maximum limitation on the amount of such Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the foregoing objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

10.    **No Recourse**

Notwithstanding that the Allowed Amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Code and Rules or is allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Disbursing Agent, the Debtors, the Reorganized Debtors, or any of their respective Professionals, consultants, partners or Affiliates or their respective successors or assigns, or any of their respective property. However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Code. THE ESTIMATION OF CLAIMS AND ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.

11.    **Amendments to Claims**

A Claim may be amended prior to the Confirmation Date only as agreed upon by the Debtors and the holder of such Claim, or as otherwise permitted by the Court, the Rules or applicable law. After the Confirmation Date, a Claim may not be amended without the

18513698v1 0920630

authorization of the Court. Any amendment to a Claim filed after the Confirmation Date shall be deemed disallowed in full and expunged without any action by the Debtors, the Disbursing Agent or the Estates, unless the Claim holder has obtained prior Court authorization for the filing of such amendment.

### 12.    Post-Petition Interest on Claims

Unless expressly provided in the Plan, the Confirmation Order, by order of the Court, or any contract, instrument, release, settlement, or other agreement entered into in connection with the Plan, Post-Petition Interest shall not accrue on or after the Petition Date on account of any Claim.

## F.    Substantive Consolidation of Zeiger Crane Rental, Inc. and Atlantic Leasing, Inc.

### 1.    Substantive Consolidation Generally.

In bankruptcy cases with affiliated debtors, a bankruptcy court may exercise its equitable powers to authorize the "substantive consolidation" of the estates of the debtor affiliates for purposes of the plan of reorganization. Substantive consolidation involves the pooling of assets and liabilities of the affected debtors. Generally, all of the debtors in the substantively consolidated group are treated as if they were a single corporate entity and economic entity. In that circumstance, a creditor of one of the substantively consolidated Debtors will be treated as a creditor of the substantively consolidated group of Debtors, and issues of individual corporate ownership or property and individual corporate liability or obligation are ignored. The Debtors seek substantive consolidation of Zeiger and Atlantic Leasing for voting and distribution purposes only.

In support of such substantive consolidation, the Debtors assert that many of the factors set forth in the applicable decisional law supporting limited substantive consolidation as proposed hereunder are present in the Zeiger Case and Atlantic Leasing Case. See *Eastgroup Props. v. Southern Motel Assocs., Ltd.*, 935 F.2d 245 (11th Cir. 1991)(movant must demonstrate that (i) there is a substantial identity between entities to be consolidated, and (ii) consolidation is necessary to avoid some harm or to realize some benefit); *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 769-70 (9th Cir. 2000).

### 2.    The Facts Supporting Substantive Consolidation of the Debtors.

Both Zeiger and Atlantic Leasing maintain the same corporate headquarters in Riviera Beach, Florida. All employees of the Debtors are employed and compensated by Zeiger. Both Zeiger and Atlantic Leasing maintained consolidated financial operations and shared a common cash management system through which Zeiger paid bills in and from the same bank accounts and deposited receipts in the same bank accounts. While Atlantic Leasing maintained a separate account, this account held only a minimal balance. Zeiger and Atlantic Leasing maintained consolidated financial statements and information.

18513698v1  0920630

In essence, almost all cash from any source, whether loans from financial institutions, sales of assets, loans from Steve Zeiger or otherwise, flowed through Zeiger's bank accounts and were used to pay the liabilities of Zeiger and Atlantic Leasing.

If the Debtors were required to recreate the Debtors' books and records to account for any intercompany claims, it would be require the expenditure of both a significant amount of time on the Debtors' part as well as professional fees. The Debtors believe this is economically and practically infeasible exercise. The Debtors assert that most, if not all, creditors did not rely on the separate credit of Zeiger or Atlantic Leasing in extending credit. Almost all unsecured creditors were scheduled with Zeiger, and secured creditors were scheduled by Zeiger and Atlantic Leasing in identical amounts.   As a result of the above, it is clear that there is and was a substantial degree of difficulty in segregating and ascertaining the individual assets and liabilities of each of the Zeiger and Atlantic Leasing.

### 3.    Conclusion

The Debtors believe that substantive consolidation as proposed in the Plan is not only appropriate under the facts and circumstances of these Chapter 11 Cases, but it is in the best interests of all holders of Allowed Claims against Zeiger and Atlantic Leasing.

Specifically, on and after the Effective Date with respect to both Zeiger and Atlantic Leasing, all assets and liabilities shall be treated as though they were pooled solely for purposes of: (a) voting on the Plan and (b) Distributions under the Plan. No Distribution shall be made hereunder on account of any Intercompany Claim held by Atlantic Leasing or Zeiger,  every Claim filed or to be filed in the Chapter 11 Cases of either Atlantic Leasing or Zeiger shall be deemed filed against both entities and shall be treated as one obligation by Atlantic Leasing and Zeiger.  Notwithstanding the substantive consolidation of the Zeiger and Atlantic Leasing, respectively, as provided herein, the substantive consolidation shall be solely for purposes of voting and Distributions and specifically shall not: (a) affect the legal and organizational structure of each such Debtors from and after the Effective Date; (b) destroy or otherwise affect the separate corporate existence of each Debtors and the ownership interest in each Debtors; or (c) divest any Debtors of any tax attributes; or (d) affect any statutory fees paid by, or accrued in respect of, any Debtors to the United States Trustee or the Clerk of the Court from the Petition Date through the Effective Date.

**This Plan shall be deemed to be a motion, pursuant to Rule 9013, by the Debtors for limited and partial substantive consolidation with respect to the Plan as set forth herein. The Debtors reserve the right to supplement the facts and law supporting the request for partial or limited substantive consolidation herein on or before the Confirmation Date. Any objection by an affected Creditor to such consolidation shall be treated as an objection to confirmation and shall be determined by the Court at the Confirmation Hearing. Failure to timely object to substantive consolidation may result in consolidation of the Zeiger and Atlantic Leasing in accordance herewith, without further hearing.**

### G.    Treatment of Executory Contracts and Unexpired Leases

1.    <u>**Assumption or Rejection of Executory Contracts and Unexpired Leases**</u>

(a)    **Executory Contracts and Unexpired Leases**

The Code grants the Debtors the power, subject to the approval of the Court, to assume or reject executory contracts and unexpired leases. If an executory contract or unexpired lease is rejected, the other party to the agreement may file a claim for damages incurred by reason of the rejection. In the case of rejection of leases of real property, such damage claims are subject to certain limitations imposed by the Code.

Pursuant to sections 365(a) and 1123(b)(2) of the Code, all executory contracts and unexpired leases between the Debtors and any Person shall be deemed <u>rejected</u> as of the Effective Date, <u>except</u> for any executory contract or unexpired lease (i) which previously has been assumed or rejected pursuant to an order of the Court entered prior to the Effective Date, (ii) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed and served prior to the Effective Date or (iii) which is listed on the Assumption List which shall be filed with the Court and served on the affected parties by no later than twenty (20) days prior to the Confirmation Hearing; *provided, however,* that the Debtorss shall have the right, on or prior to the Confirmation Date, to amend the Assumption List to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed, respectively, assumed or rejected. The Debtors shall provide notice of any amendments to the Assumption List to the non-Debtors parties to the executory contracts and unexpired leases affected thereby. The listing of a document on the Assumption List shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

(b)    **Schedules of Rejected Executory Contracts and Unexpired Leases; Inclusiveness**

Each executory contract and unexpired lease listed or to be listed on the Assumption List that relates to the use or occupancy of real property shall be deemed to include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on the Assumption List and (ii) all executory contracts or unexpired leases appurtenant to the premises listed on the Assumption List, including, without limitation, all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vault, tunnel or bridge agreements or franchises, and any other interests in real estate or rights <u>in rem</u> relating to such premises, unless any of the foregoing agreements previously have been assumed.

(c)    **Insurance Policies**

Each of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, including without limitation, any retrospective premium rating plans relating to such policies, shall be treated as executory contracts under the Plan. Notwithstanding the

18513698v1  0920630

foregoing, distributions under the Plan to any holder of a Claim covered by any insurance policies and related agreements, documents or instruments that are assumed hereunder, shall comply with the treatment provided under the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver or release of any Action that the Debtors may hold against any entity, including, without limitation, the insurers under any of the Debtors' policies of insurance.

**(d)    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases**

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Code, of the assumption by the Debtors of the executory contracts and unexpired leases assumed and assigned pursuant to Article VI of the Plan, and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan.

**2.    <u>Cure of Defaults</u>**

To the extent that cure payments are due with respect to an executory contract or unexpired lease to be assumed pursuant to the Plan, the amount of such cure payment shall be listed in the motion or the Assumption List. To the extent that the non-debtor party to any executory contract or unexpired lease disagrees with the cure amount disclosed on the Assumption List, such party must file a notice of dispute with the Court and serve such notice on the Debtors by no later than five (5) days prior to the Confirmation Hearing. Except as may otherwise be agreed to by the parties, within sixty (60) days after the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed pursuant to the Plan in accordance with section 365(b)(1) of the Code. All disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties. If there are any objections filed, the Court shall hold a hearing. In the event the Court determines that the cure amount is greater than the cure amount listed by the Debtors, the Debtors may elect to reject the contract or unexpired lease and not pay such greater cure amount.

**3.    <u>Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan</u>**

Claims arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Court and/or served upon the Debtors or Reorganized Debtors or as otherwise may be provided in the Confirmation Order, by no later than thirty (30) days after the later of (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order and (iii) notice of an amendment to the Assumption List. Any Claim not filed within such time will be forever barred from assertion against the Debtors, the Reorganized Debtors, the Estates, and Property of the Estates. Unless otherwise ordered by the Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as Unsecured Claims under the Plan.

18513698v1  0920630

4. **Indemnification Obligations**

For purposes of the Plan, the obligations of the Debtors to defend, indemnify, reimburse, or limit the liability against any claims or obligations of their present and former partners or employees who served as partners, respectively, on or after the Petition Date, pursuant to state law or specific agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged, irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on or after the Petition Date.

5. **Compensation and Benefit Programs**

Except as provided in the Plan, all employment and severance practices and policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to its shareholders, members or employees who served as directors, officers and employees, respectively, on or after the Petition Date, including, without limitation, all savings plans, retirement plans (exclusive of defined benefit plans), health care plans, severance benefit plans, incentive plans, workers' compensation programs and life, disability and other insurance plans, are treated as executory contracts under the Plan. If assumed, the Debtors reserve the right to modify any and all such compensation and benefit practices, plans, policies, and programs in accordance with the terms thereof.

H. **Provisions Regarding Corporate Governance and Management of the Reorganized Debtors**

On the Effective Date, the management, control and operation of the Reorganized Debtors shall become the general responsibility of the managing member(s) and boards of directors of the Reorganized Debtors, which shall, thereafter, have the responsibility for the management, control and operation of the Reorganized Debtors.

1. **Meetings of Shareholder(s)/Managing Member(s)**

In accordance with the applicable Reorganized Debtors' operating agreement, or certificates of incorporation and bylaws, as the same may be amended from time to time, the first annual meeting of the members or stockholders of Reorganized Debtors shall be held on a date selected by the managing member(s) or boards of directors.

2. **Bylaws and Certificates of Incorporation**

On the Effective Date, the adoption of the applicable Reorganized Debtors' certificate of incorporation and bylaws shall be authorized and approved in all respects to be effective as of the Effective Date, in each case without further action under applicable law, regulation, order, or rule, and including without any further action by the stockholders or directors of the Debtors, the Debtors in Possession or the Reorganized Debtors. The applicable Reorganized Debtors' certificate of incorporation shall prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Code, and authorize any other actions necessary to implementing the Plan, subject to further amendment of such certificates of incorporation as permitted by applicable law and the applicable organizational documents.

18513698v1 0920630

### 3.    Selection of Board Members/Managing Member(s)

The initial managing member of Dyer Road shall be Steve Zeiger. The member of te boards of directors of Zeiger and Atlantic Leasing shall be Steve Zeiger. Thereafter, the managing member(s) and members of the boards of directors shall be selected in accordance with the applicable Reorganized Debtors' operating agreement or certificate of incorporation, as the case may be. As of the Effective Date of the Plan, the managing member(s) and members of the initial boards of directors shall in each case serve until their respective resignations or removal in accordance with applicable law, or the applicable organizational documents. Elections, removal and terms of directors and managing member(s) will be in accordance with applicable general corporate and limited liability company law.

### 4.    Corporate Governance

The business and affairs of the Reorganized Debtors shall be managed by their managing member(s) and boards of directors in accordance with the applicable Reorganized Debtors' operating agreement, bylaws, articles of incorporation and applicable non-bankruptcy law.

### 5.    Officers/Managing Member(s)

The initial officers of Zeiger and Atlantic Leasing shall be Steve Zeiger – Chief Executive Officer. The initial managing member of Dyer Road shall be Steve Zeiger. After the Effective Date, the managing member(s) and officers of the Reorganized Debtors shall be determined by the member(s) or boards of directors, in each case until their respective resignations or removal in accordance with applicable law and the applicable organizational documents. Mr. Zeiger shall receive an initial annual salary in the amount of $250,000.00 (which may be adjusted based on the operating results of the Reorganized Debtors), as well as a $1,000.00 per month vehicle allowance and medical insurance coverage.

## I.    Implementation and Effect of Confirmation of the Plan

Upon confirmation of the Plan, in accordance with the Confirmation Order, the Debtors or Reorganized Debtors, as the case may be, will be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan. In addition to the provisions set forth elsewhere in the Plan, the following shall constitute the means for implementation of the Plan.

### 1.    General

Upon confirmation of the Plan, and in accordance with the Confirmation Order, the Debtors or Reorganized Debtors, as the case may be, will be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan.

Distributions under the Plan shall be made from the Reorganized Debtors' cash flow from operations (Classes 1 through 8) as more specifically provided for in the Disclosure Statement, as well as Net Proceeds of Actions (Class 9).

18513698v1 0920630

The pro forma financials and supporting schedules are attached to the Disclosure Statement as Exhibit "C." The assumptions for the pro forma financials are included, but essentially the Reorganized Debtors will have the following equipment configurations:

(a)    Crawler Cranes.  The Reorganized Debtors will rent three (3) crawler cranes from People's.  Four (4) crawler cranes will be financed, two (2) from FCC and one each from TCF and Kelly.  The Reorganized Debtors will rent additional cranes post-confirmation and are in the process of finalizing certain rentals.

(b)    Hydraulic Cranes.  The Reorganized Debtors will rent two (2) hydraulic cranes from Peoples.  One hydraulic crane will be financed with FCC.   The Reorganized Debtors will rent five (5) additional cranes post-confirmation.

The Debtors do not anticipate any problems in renting cranes post-confirmation, and rents will be paid based on utilization.  Renting cranes will result in lower debt-servicing needs and will enable the Reorganized Debtors to have more flexibility in inventory available to meet demands.  Rather than being burdened with debt service associated with the outright acquisition of cranes, the Reorganized Debtors will be able to vary the inventory of cranes based on demand and economy.

Other revenue will be derived from "move in" and "move out" revenue associated with crane rentals, service and repair revenues, trucking, and rental income from the lease of real estate owned by Dyer Road.

Payments to Secured Creditors, other than People's, are based on interest-only payments in Year 1, and followed by six (6) years of principal and interest payments calculated based on a sixty (60) month amortization using an interest rate of seven percent (7%) per annum.  The interest-only period will enable the Reorganized Debtors to ramp-up revenues during the initial year following the Effective Date.  As payments convert from interest-only to principal and interest payments, the payments required to be made to People's will decrease at or around the same time, as a result of having redeemed or otherwise disposed of the real estate owned by Dyer Road consistent with the Settlement.

The Debtors project that revenues will gradually increase based on increasing demand for cranes, and due further to the fewer number of crane providers who have survived the recessionary conditions.

2.    **The Reorganized Debtors**

Except as otherwise provided in the Plan, on the Effective Date of the Plan, all Assets of the Debtors shall be vested in the Reorganized Debtors, and the Reorganized Debtors shall assume all of the Debtors' rights, obligations and liabilities under the Plan.

3.    **Effectiveness of Instruments and Agreements**

On the Effective Date, all documents described in and all other agreements entered into or documents issued pursuant to the Plan and/or any agreement entered into or instrument or document issued in connection with any of the foregoing, as applicable, shall become effective

18513698v1  0920630

and binding upon the parties thereto in accordance with their respective terms and conditions and shall be deemed to become effective simultaneously.

### 4.    Distributions

Distributions shall be made by the Reorganized Debtors in accordance with the Plan. Distributions (including payment of any required fees to the United States Trustee under 28 U.S.C. § 1930(a)(6)) shall be made from the account of Zeiger Crane Rental, Inc.

### 5.    Corporate Action

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the managing member(s) or member(s), or officers and directors of the Debtors or Reorganized Debtors or their successors in interest under the Plan, shall be deemed to have occurred and shall be in full force and effect from and after the Effective Date pursuant to the applicable general corporation law, without any requirement of further action by the member(s), managing member(s), or officers and directors of the Debtors or Reorganized Debtors.

### 6.    No Change of Control

Any acceleration, vesting or similar change of control rights of any Person under employment, benefit or other arrangements with the Debtors that could otherwise be triggered by the entry of the Confirmation Order or the consummation of the Plan or any of the transactions contemplated thereby shall be deemed to be waived and of no force or effect.

### 7.    Restructuring Transactions

On and after the Effective Date, the Reorganized Debtors may enter into such transactions and may take such actions as may be necessary or appropriate to effect a corporate restructuring of their businesses, subject to the terms, conditions and restrictions set forth in the Bylaws, or otherwise applicable to, the Reorganized Debtors.  Such restructuring may include one or more mergers, consolidations, restructures, dispositions, liquidations, or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate (collectively, the "Restructuring Transactions").  The actions to effect the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.  The Restructuring Transactions may include one or more mergers, consolidations, restructures, dispositions, liquidations, or dissolutions, as may be determined by the Reorganized Debtors to be necessary

18513698v1  0920630

or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of the Reorganized.  In each case in which the surviving, resulting, or acquiring entity in any such transaction is a successor to the Reorganized Debtors, such surviving, resulting, or acquiring corporation will perform the obligations of the Reorganized Debtors pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against the Reorganized Debtors.  Notwithstanding anything in this Section VI7 to the contrary, nothing in this Section VI7 is intended or should be construed as permitting the Reorganized Debtors to violate, amend or modify the provisions of the Settlement without the prior written consent of People's.

8. **Operation of the Debtors in Possession Between the Confirmation Date and the Effective Date**

The Debtors shall continue to operate as Debtors in Possession in the ordinary course, consistent with past practices, subject to the supervision of the Court and pursuant to the Code and the Rules during the period from the Confirmation Date through and until the Effective Date, and any obligation incurred by the Debtors during that period shall constitute a Post-Confirmation Administrative Claim.

9. **Administration After the Effective Date**

Except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses, and may use, acquire, and dispose of their property, free of any restrictions of the Code and Rules from and after the Effective Date.

10. **Term of Bankruptcy Injunction or Stays**

All injunctions or stays provided for in these Cases under sections 105 or 362 of the Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

11. **Revesting of Assets**

Except as otherwise provided in the Plan, pursuant to section 1141 of the Code, the Property of the Estates of the Debtors, including, without limitation, the Actions, shall revest in the Reorganized Debtors on the Effective Date, free and clear of all Liens, Claims and interests of holders of Claims and Equity Interests.

12. **Causes of Action**

As of the Effective Date, pursuant to section 1123(b)(3)(B) of the Code, any and all Actions accruing to the Debtors and Debtors in Possession, including, without limitation, the Actions under sections 510, 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Code, shall become assets of the Reorganized Debtors, and the Reorganized Debtors shall have the authority to commence and prosecute such Actions for the benefit of the Estate.

**The Debtors and the Reorganized Debtors reserve all Actions against third parties, including, without limitation, Avoidance Actions.  Avoidance Actions include any Action**

against any creditor or third party who may have received a transfer of funds or other property from the Debtors within ninety (90) days preceding the Petition Date. Therefore, any party who may have received a payment from the Debtors, as disclosed in response to question 3 of the statements of financial affairs filed in the Cases, may be the subject of a potential Avoidance Action.

Notwithstanding anything herein to the contrary, the Debtors will seek approval of a resolution of any and all Avoidance Actions against Mr. Steve Zeiger, including, without limitation, any party, including his family members, who received payments from the Debtors to or for the benefit of Steve Zeiger (the "**S. Zeiger Avoidance Action Resolution**"). In the two (2) years preceding the Petition Date, the Debtors paid $2,925,657.00 to or for the benefit of Mr. Zeiger. Assuming a reasonable salary of $290,000.00 per year, the net payments to or for the benefit of Mr. Zeiger were $2,345,657.00 (the "**Net 2-Year Payments**"). During the one year preceding the Petition Date, the Debtors paid $1,649,600.00 (net of salary) to or for the benefit of Mr. Zeiger (the "**Net 1-Year Payments**"). During this same two (2) year period, Mr. Zeiger advanced $4,465,000.00 to the Debtors (the "**S. Zeiger Advances**").

The Debtors estimate the total amount of allowed unsecured claims against the Estates are in the amount of $4,281,896.00, excluding any claims of Mr. Zeiger (the "**Unsecured Claims**"). The Unsecured Claims include the following claims for which Mr. Zeiger may be a co-obligor or may have personally guaranteed the obligation: (a) FCC ($1,300,000.00); (b) Exact Crane ($872,350.00); (c) Kelly Tractor ($830,481.00); and (d) Sims ($750,000.00) (the "**Zeiger Claims**"). The amount of the Unsecured Claims, net of the Zeiger Claims, are $529,065.00 (the "**Zeiger Distributable Claims**"). The Zeiger Distributable Claims represent Unsecured Claims for which Mr. Zeiger is not personally liable in any capacity.

Commencing in the thirteenth (13th) month following the Effective Date of the Plan, and each month thereafter for a period of sixty (60) months, Mr. Zeiger shall pay $2,500.00 (the "**S. Zeiger Contribution**") to Zeiger Crane Rental, Inc. for purposes of distributing the S. Zeiger Contributions to the holders of the Zeiger Distributable Claims. The total amount of S. Zeiger Contributions to be distributed will be $150,000.00, which represents a return of approximately 37% to the holders of Zeiger Distributable Claims ($150,000.00/$529,065.00).

In arriving at the amount of the S. Zeiger Contribution, the Debtors and Mr. Zeiger considered the following:

(a)    Without Mr. Zeiger admitting any liability on any Avoidance Actions, the most that Mr. Zeiger could be liable for is (i) $2,345,657.00 under section 548 of the Code (the Net 2-Year Payments), or (ii) $1,649,600.00 under section 547 of the Code (the Net 1-Year Payments). If these amounts are added to the Unsecured Claims, and assuming that Mr. Zeiger would have a claim in the amount of any adverse judgment satisfied, the total Unsecured Claims would be either $5,931,496.00 ($1,649,600.00 plus $4,281,896.00) or $6,627,553.00 ($2,345,657.00 plus $4,281,896.00), respectively. After satisfying any adverse judgment under section 550 of the Code, Mr. Zeiger would hold 27.81%

18513698v1  0920630

($1,649,600.00/$5,931,496.00) or 35.39% ($2,345,657.00/$6,627,553.00) of the Unsecured Claims. Accordingly, out of the $2,345,657.00 recovered and distributable to holders of Unsecured Claims, Mr. Zeiger would receive $830,128.00 (.3539($2,345,657.00)) and the remaining holders of Unsecured Claims would receive $1,515,529.00 (.6461($2,345,657.00)), assuming the maximum recovery under section 548 of the Code. On the other hand, out of the $1,649,600.00 recovered and distributable to holders of Unsecured Claims, Mr. Zeiger would receive $458,754.00 (.2781($1,649,600.00))and the remaining holders of Unsecured Claims would receive $1,190,846.00 (.7219($1,649,600.00)) assuming the maximum recovery under section 547 of the Code. Consequently, the maximum amounts distributable to holders of Unsecured Claims (excluding any claims of Mr. Zeiger) would be between $1,190,846.00 and $1,515,529.00.

(b)     The Zeiger Distributable Claims represent 12.36% of the Unsecured Claims ($529,065.00/$4,281,896.00) (excluding any claims of Mr. Zeiger). Therefore, the Zeiger Distributable Claims would receive 12.36% of $1,190,846.00 or $1,515,529.00, or $147,129.00 or $187,219.00, respectively. The foregoing does not take into account (i) legal fees and costs associated with litigation, (ii) risks associated with collection, or (iii) any additional claims of Mr. Zeiger.

(c)     Mr. Zeiger intends to approach the holders of the Zeiger Claims (FCC, Kelly, Sims and Exact Crane) in an effort to obtain their agreement to forego any distributions from the S. Zeiger Contributions. If Mr. Zeiger is able to obtain their agreement, the returns for the Zeiger Distributable Claims will be maximized.

(d)     If Mr. Zeiger is sued and does not prevail on any Avoidance Actions for the amount for which he may be exposed, this could have a negative impact on the Debtors' reorganization efforts. Mr. Zeiger's personal assets would be exposed, and Mr. Zeiger would have no resources with which to satisfy claims of People's, FCC and others prior to or when forbearance agreements with such creditors expire. Indeed, the Zeiger Claims have recourse against Mr. Zeiger and may, in the event of default in the forbearance agreements, pursue Mr. Zeiger's personal assets. These creditors do not stand to gain from Mr. Zeiger being pursued on Avoidance Actions. Furthermore, payment of the S. Zeiger Contributions results in the holders of the Zeiger Distributable Claims likely receiving more than if Mr. Zeiger was sued on the Avoidance Actions. Not only would attorneys' fees and costs, as well as other claims, including the Zeiger Claims, dilute any distributions to the Zeiger Distributable Claims, but a risk of collection would likely exist.

The S. Zeiger Avoidance Action Resolution is subject to (a) the entry of a Confirmation Order, (b) the Effective Date of the Plan, and (c) Class 9 voting to support the Plan.

If the S. Zeiger Avoidance Action Resolution is approved and effective, Mr. Zeiger will subordinate any Claims he may possess against the Debtors and Reorganized Debtors pending satisfaction of the S. Zeiger Contributions. Mr. Zeiger filed a proof of claim against the Estates in excess of $2,000,000.00.

18513698v1  0920630

The Plan will represent a request to approve the S. Zeiger Avoidance Action Resolution under Rule 9019 of the Bankruptcy Rules. The entry of the Confirmation Order shall constitute an order approving the S. Zeiger Avoidance Action Resolution. In the event the S. Zeiger Avoidance Action Resolution is approved, Mr. Zeiger and any party who received a Net 2-Year Payment or Net 1-Year Payment will be released from any liability on account of any Avoidance Action.

13.    **Objections to Claims**

The Debtors and/or the Reorganized Debtors, as the case may be, shall pursue any objections to Claims.

14.    **Settlements**

After the Effective Date, the Reorganized Debtors shall have the authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such Actions with the approval of the Court. Any settlement or compromise of any Action or objection to Claim shall be subject to final approval of the Court and the standards applicable under Rule 9019.

15.    **Discharge of Debtors**

The rights afforded herein and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge and release of Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Filing Date, against the Debtors in Possession, the Estates, or any of the assets or properties under the Plan. Except as otherwise provided herein, (i) on the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied, discharged and released in full, and (ii) all Persons shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors and assigns, or their assets or properties any other or further Claims or Equity Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest and whether or not such holder has voted to accept or reject the Plan. Notwithstanding the foregoing, nothing in the Plan shall (a) release, discharge, enjoin or preclude any Claim that has not arisen as of the Effective Date that any governmental unit may have against the Debtors, (b) shall release, nullify or enjoin the enforcement of any liability to a governmental unit under environmental statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of the Confirmation Order, or (c) shall release, discharge, enjoin or preclude any Claim that any Creditor may have against any non-debtor party who may be liable on any Claim with any of the Debtors, except as otherwise provided in the Plan.

16.    **Injunction Related to Discharge**

Except as otherwise expressly provided in the Plan, the Confirmation Order or a separate order of the Court, all Persons who have held, hold or may hold Claims against or Equity Interests in the Debtors, are permanently enjoined, on and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest, (ii) enforcing, attaching, collecting or recovering by

18513698v1 0920630

any manner or means of any judgment, award, decree or order against the Debtors on account of any such Claim or Equity Interest, (iii) creating, perfecting or enforcing any Lien or asserting control of any kind against the Debtors or against the property or interests in property of the Debtors on account of any such Claim or Equity Interest, and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or against the property or interests in property of the Debtors on account of any such Claim or Equity Interest. Such injunctions shall extend to successors and assigns of the Debtors (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property. Notwithstanding the foregoing, nothing in the Plan shall release, discharge, enjoin or preclude any Claim that any Creditor may have against any non-debtor party who may be liable on any Claim with any of the Debtors, except as otherwise provided in the Plan.

**17.     Injunction Against Interference with the Plan**

Upon the entry of a Confirmation Order with respect to the Plan, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, members, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan, except with respect to actions any such entity may take in connection with the pursuit of appellate rights.

**J.     Confirmation and Effectiveness of the Plan**

**1.     Conditions Precedent to Confirmation**

The Plan shall not be confirmed by the Court unless and until the following conditions shall have been satisfied or waived pursuant to Section 10.04 of the Plan:

(a)     The Confirmation Order shall be in form and substance reasonably acceptable to the Debtors and shall include, among other things, a finding of fact that the Debtors, the Reorganized Debtors and their respective shareholders, members, officers, directors, employees, advisors, attorneys, and agents acted in good faith within the meaning of and with respect to all of the actions described in section 1125(e) of the Code and are, therefore, not liable for the violation of any applicable law, rule or regulation governing such actions; and

(b)     the Clerk of the Court shall have entered the Confirmation Order on the Docket.

**2.     Conditions Precedent to Effectiveness**

The Plan shall not become effective unless and until the following conditions have been satisfied or waived pursuant to Section 10.04 of the Plan:

(a)     The Confirmation Order shall have been entered and shall be a Final Order (with no modification or amendment thereof), and there shall be no stay or injunction that would prevent the occurrence of the Effective Date;

(b)     The statutory fees owing to the United States Trustee shall have been paid in full; and

(c)    All other actions, authorizations, filings, consents and regulatory approvals required (if any) shall have been obtained, effected or executed in a manner acceptable to the Debtors and remain in full force and effect or, if waivable, waived by the Person or Persons entitled to the benefit thereof.

### 3.    Effect of Failure of Conditions

If each condition to the Effective Date specified in the Plan has not been satisfied or duly waived within ninety (90) days after the Confirmation Date, then upon the filing of a motion by the Debtors made before the time that all conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Court; *provided, however*, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated, the Plan shall be deemed null and void in all respects, including without limitation the discharge of Claims pursuant to section 1141 of the Code and the assumptions or rejections of executory contracts and unexpired leases as provided by the Plan, and nothing contained herein shall (1) constitute a waiver or release of any Action by, or Claims against, the Debtors, or (2) prejudice in any manner the rights of the Debtors, any Creditor or party in interest.

### 4.    Waiver of Conditions

The Debtors may waive one or more of the conditions precedent to confirmation of the Plan set forth in Section 10.01 of the Plan, or the condition precedent to effectiveness of the Plan set forth in Section 10.02 of the Plan.  The Debtors may waive in writing one or more of the other conditions precedent to confirmation and effectiveness of the Plan, without further notice to parties in interest or the Court without a prior hearing.

## K.    Summary of Other Provisions of the Plan

The following paragraphs summarize certain other significant provisions of the Plan. The Plan should be referred to for the complete text of these and other provisions of the Plan.

### 1.    Retention of Jurisdiction

The Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Code and for, among other things, the following purposes:

(a)    to hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, if any are pending, and the allowance of Claims resulting therefrom;

(b)    to determine any and all adversary proceedings, motions, applications and contested matters, and other litigated matters pending on the Confirmation Date;

(c)    to hear and determine all Actions, including, without limitation, Actions commenced by the Debtors, the Reorganized Debtors, or any other party in interest with standing

18513698v1  0920630

to do so, pursuant to sections 505, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Code, collection matters related thereto, and settlements thereof;

      (d)    to hear and determine any objections to or the allowance, classification, priority, compromise, estimation or payments of any Administrative Claims, Claims or Equity Interests;

      (e)    to ensure that Distributions to holders of Allowed Claims are accomplished as provided in the Plan;

      (f)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

      (g)    to issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Code;

      (h)    to consider any amendments to or modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in the Plan, or any order of the Court, including, without limitation, the Confirmation Order;

      (i)    to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 330, 331, and 503(b) of the Code;

      (j)    to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, including, without limitation, any disputes arising under the Settlement; *provided, however,* venue of the foreclosure action involving the real estate owned by Dyer Road Road Property, LLC – as contemplated in the Settlement with People's – shall lie in the Circuit Court in and for Palm Beach County, Florida;

      (k)    to recover all Assets of the Debtors and Property of the Estates, wherever located;

      (l)    to determine any Claim of or any liability to a governmental unit that may be asserted as a result of the transactions contemplated herein;

      (m)    to enforce the Plan, the Confirmation Order and any other order, judgment, injunction or ruling entered or made in the Cases, including, without limitation, the discharge, injunction, exculpation and releases provided for in the Plan;

      (n)    to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

      (o)    to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Code (including, but not limited to, an expedited determination under section 505(b) of the Code of the tax liability of the Debtors for all taxable periods through the Effective Date for all taxable periods of the Debtors through the liquidation and dissolution of such entity);

(p)    to hear any other matter not inconsistent with the Code; and

(q)    to enter a final decree closing the Cases; provided however, that nothing in the Plan shall divest or deprive any other court or agency of any jurisdiction it may have over the Reorganized Debtors under applicable environmental laws.

## 2.    **Effectuating Documents and Further Transactions.**

The Debtors are authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to implement, effectuate and further evidence the terms and conditions of the Plan and any notes or other interests issued pursuant to the Plan.

## 3.    **Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Code, the issuance, transfer or exchange of notes or other interests under the Plan, including creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated by the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

## 4.    **Authorization to Request Prompt Tax Determinations.**

The Debtors are authorized to request an expedited determination under section 505(b) of the Code of the tax liability of the Debtors, for all taxable periods through the Effective Date.

## 5.    **Exculpation.**

**Subject to the occurrence of the Effective Date, and except as otherwise provided in the Settlement solely with respect to People's, neither the Debtors, the Reorganized Debtors or any of their respective partners, members, officers, directors, agents, financial advisors, attorneys, employees, holders of Equity Interests, partners, affiliates and representatives (the "Exculpated Parties") shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Case, the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan; *provided, however,* that the foregoing shall not operate as a waiver or release for (i) any express contractual obligation owing by any such Person, (ii) willful misconduct or gross negligence, and (iii) with respect to Professionals, liability arising from claims of professional negligence which shall be governed by the standard of care otherwise applicable to professional negligence claims under applicable non-bankruptcy law, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided further that nothing in the Plan shall, or shall be deemed to, release the Exculpated Parties, or exculpate the Exculpated Parties with respect to, their respective obligations or covenants arising pursuant to the Plan; *provided further* that the foregoing shall not operate as a waiver or**

44

release of Claims by (a) governmental entities arising under environmental laws, or (b) any Creditor against any non-debtor party who may be liable on any Claim with any of the Debtors, except as otherwise provided in the Plan.

### 6.    Injunction Relating to Exculpation

**The Confirmation Order will contain an injunction, effective on the Effective Date, permanently enjoining the commencement or prosecution against the Debtors, the Reorganized Debtors, and any other Person, whether derivatively or otherwise, of any Actions or causes of action exculpated, released or discharged pursuant to this Plan against the Exculpated Parties.**

### 7.    Payment of Statutory Fees

The Debtors shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6). After confirmation, the Reorganized Debtors shall file with the Court and serve on the United States Trustee a financial report regarding all income and disbursements, including all plan payments, for each required period (or portion thereof) the Cases remain open.

### 8.    Amendment or Modification of Plan

Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date in conformity with section 1127(a) of the Code, provided that the Plan, as altered, amended or modified, satisfies the conditions of sections 1122, 1123 and 1129 of the Code, and the Debtors shall have complied with section 1125 of the Code. The Plan may be altered, amended or modified by the Debtors at any time after the Confirmation Date in conformity with section 1127(b) of the Code, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Code and the Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Court.

### 9.    Severability

In the event that the Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the holder or holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void or unenforceable. The invalidity, voidness or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan. The Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered

18513698v1  0920630

or interpreted. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 10. Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Actions by or against the Debtors or any other Person, an admission against interests of the Debtors, nor shall it prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

### 11. Binding Effect Notices

The Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Equity Interests, and their respective successors and assigns.

### 12. Notices

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Debtors:**

> Zeiger Crane Rental, Inc.
> 4651 Dyer Boulevard
> Riviera Beach, Florida 33407
>
> Atlantic Leasing, Inc.
> 4651 Dyer Boulevard
> Riviera Beach, Florida 33407
>
> Dyer Road Property, LLC
> 4651 Dyer Boulevard
> Riviera Beach, Florida 33407

**With copies to:**

Hinshaw & Culbertson, LLP
Attention: Michael D. Seese, Esq.
One East Broward Boulevard, Suite 1010
Ft. Lauderdale, Florida 33301
Telephone No. (954) 467-7900

18513698v1 0920630

13.    **Governing Law**

Except to the extent the Code, Rules or other federal law is applicable, or to the extent the Plan or any agreement entered into pursuant to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principles of conflicts of law of such jurisdiction.

14.    **Withholding and Reporting Requirements**

In connection with the consummation of the Plan, the Debtors and the Reorganized Debtors, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

15.    **Section 1125(e) of the Code**

As of the Confirmation Date, the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Code.  As of the Confirmation Date, the Debtors and their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, Affiliates and representatives shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Code in the offer and issuance of the new securities hereunder, and therefore are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections hereof or other offer under the Plan.

16.    **Filing of Additional Documents**

On or before Substantial Consummation of the Plan, the Debtors shall file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

17.    **No Admissions**

Notwithstanding anything in the Plan to the contrary, nothing contained in the Plan shall be deemed as an admission by any Person with respect to any matter set forth in the Plan or herein.

18.    **Waiver of Bankruptcy Rule 3020(e) and 7062**

The Debtors may request that the Confirmation Order include (a) a finding that Rules 3020(e) and 7062 shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

18513698v1 0920630

19.    **Time**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Court, the provisions of Rule 9006 shall apply.

20.    **Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be Substantially Consummated under sections 1101 and 1127(b) of the Code.

21.    **Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the Cases under section 1112(b)(7) of the Code after entry of the Confirmation Order if there is a default in performing the conditions to effectiveness of the Plan. If the Court orders the Cases converted to Chapter 7 after the entry of the Confirmation Order, this Plan provides that property of the Debtors' Estates that have not been disbursed pursuant to the provisions herein will revest in the Chapter 7 estates and that the automatic stay will be reimposed upon the revested property to the extent that relief from the stay was not previously authorized by the Court during the pendency of the Cases. The Confirmation Order may also be revoked under certain limited circumstances. The Court may revoke the Confirmation Order if and only if such order was procured by fraud and if a party in interest brings a motion to revoke such Confirmation Order within 180 days after the entry of the Confirmation Order.

22.    **Final Decree**

Once there has been Substantial Consummation of the Plan, the Reorganized Debtors shall file a motion with the Court to obtain a final decree to close the Cases.

23.    **Inconsistency**

In the event of any inconsistency between the Plan and the Disclosure Statement, any Exhibit to the Plan or the Disclosure Statement or any other instrument or document created or executed pursuant to the Plan, the Plan shall govern. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall govern. Notwithstanding anything in Section 12.22 of the Plan to the contrary, the Settlement shall prevail in the event of any inconsistency with the Plan.

24.    **No Interest or Attorneys' Fees**

Except as otherwise provided under the Plan, or as ordered by the Court, no interest, penalty or other charge, including any late charge, arising from and after the Filing Date, an no award or reimbursement of any attorneys' fees or other related cost or disbursement, shall be allowed on, or in connection with, any Claim, unless otherwise provided under the Plan or awarded by the Court.

18513698v1 0920630

25. **Successors and Assigns**

This Plan and all the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

26. **Headings**

The headings of articles, paragraphs and sub-paragraphs in this Plan are inserted for convenience only and shall not affect the interpretation of any provision of this Plan.

27. **No Penalty for Prepayment**

The Debtors shall at any time be permitted to prepay, in whole or in part, any claim treated under this Plan. Except as otherwise provided in the Settlement solely with respect to People's, neither the Debtors nor the Reorganized Debtors shall be liable for payment of any sum or interest in the form of a penalty relating to the partial or full prepayment of any claim treated under this Plan, as permitted herein.

28. **Savings Clause**

Any minor defect or inconsistency in the Plan may be corrected or amended by the Confirmation Order.

29. **Remedy of Defects**

After the Effective Date, the Reorganized Debtors may, with approval of the Court, and so long as it does not materially and adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and effect of the Plan.

## VI.

## CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

A. **Risk that Distributions Will be Less than Estimated by the Debtors**

The ultimate recoveries under the Plan to holders of Claims are uncertain. The factors specified below assume that the Plan is approved by the Court and that the conditions precedent to the Effective Date of the Plan are satisfied or otherwise waived.

18513698v1  0920630

The Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest. Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any Creditor whose Claim or Equity Interest is subject to a successful objection. Any holder of such Claim or Interest may not receive the estimated Distributions set forth herein.

**A SUBSTANTIAL AMOUNT OF TIME MAY ELAPSE BETWEEN THE EFFECTIVE DATE AND THE RECEIPT OF A FINAL DISTRIBUTION UNDER THE PLAN, BECAUSE: (I) THE VARIOUS CLASSES OF CLAIMS, AS WELL AS THE CATEGORIES OF ADMINISTRATIVE AND PRIORITY TAX CLAIMS, MAY HAVE SUBSTANTIAL AND/OR COMPLICATED DISPUTED CLAIMS; AND (II) THE REORGANIZED DEBTORS MAY NOT REALIZE RECOVERIES FOR A DELAYED PERIOD RELATING TO CAUSES OF ACTION.**

**B.      Industry Conditions and Financial Condition of Reorganized Debtors**

    **1.      Indebtedness**

The degree to which the Reorganized Debtors are leveraged could have important consequences to holders of Allowed Claims, including the following:

    (a)      the Reorganized Debtors' ability to obtain any necessary financing in the future for working capital, capital expenditures, general corporate purposes or other purposes may be impaired or such financing may not be available on favorable terms;

    (b)      a substantial portion of the Reorganized Debtors' cash flow from operations may be dedicated to the payment of principal and interest on indebtedness, thereby reducing the funds available to it for its operations;

    (c)      the Reorganized Debtors may experience some difficulty in meeting their debt service requirements as they become due and force the Reorganized Debtors to modify operations;

    (d)      the Reorganized Debtors may be restricted in its ability to utilize asset sales as a means to create liquidity;

    (e)      the Reorganized Debtors may be more highly leveraged than certain of competitors, which may place it in a competitive disadvantage; and

    (f)      the Reorganized Debtors may be more vulnerable to a further downturn in general economic conditions or their businesses.

Even if the Plan is consummated, the Reorganized Debtors' businesses may not be able to generate sufficient cash flow from operations in the future to service their debt, make necessary capital expenditures or meet other cash needs. If the Reorganized Debtors are unable to service their indebtedness or to obtain additional financing, as needed, it would have a material adverse effect on the business and financial condition.

18513698v1 0920630

### 2. Key Personnel

The success of the Debtors may depend in large part upon the abilities to retain qualified management. Reorganized Debtors' failure to retain key personnel could have a material adverse effect on operations.

### 3. Objections to Classifications

Section 1122 of the Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Code. However, there can be no assurance that the Court would reach the same conclusion.

### 4. Risk of Nonconfirmation of the Plan

Even if all Impaired Classes accept the Plan, the Plan might not be confirmed by the Court. Section 1129 of the Code sets forth the requirements for the confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity holders would receive if the Debtors were liquidated under Chapter 7 of the Code. There can be no assurance, however, that the Court would also conclude that the requirements for confirmation of the Plan have been satisfied.

## VII.

## CONFIRMATION OF THE PLAN

Under the Code, the following steps must be taken to confirm the Plan:

### A. The Confirmation Hearing

The Code requires the Court, after notice, to hold a confirmation hearing before a plan of reorganization may be confirmed. The Confirmation Hearing in respect of the Plan has been scheduled in accordance with the Disclosure Statement Order before the Honorable Erik P. Kimball, United States Bankruptcy Judge, at the United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division, 1515 North Flagler Drive, Room 801, West Palm Beach, Florida, 33401. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or number and type of shares of Equity Interest held by the objector. The Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received in accordance with the Disclosure Statement Order. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or any adjourned Confirmation Hearing.

18513698v1 0920630

Objections to Confirmation of the Plan are governed by Rule 9014.

**B.**     **Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Court will confirm the Plan only if all of the requirements of section 1129 of the Code are met. Among the requirements for Confirmation of a plan are that the plan is (i) accepted by all Impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible and (iii) in the "best interests" of creditors and stockholders that are impaired under the plan.

**1.**     **Unfair Discrimination and Fair and Equitable Tests**

To obtain nonconsensual confirmation of the Plan, the Court must determine that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class. The Code provides a non-exclusive definition of the phrase "fair and equitable." The Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

(a)     Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) of this subparagraph.

(b)     Unsecured Creditors. Either (i) each non-accepting impaired unsecured creditor class receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c)     Equity Interests. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

**2.**     **Feasibility**

The Code permits a plan to be confirmed if it is not likely to be followed by liquidation or the need for further financial reorganization.

18513698v1  0920630

3.    **Best Interests Test**

With respect to each Impaired Class of Claims and Equity Interests, confirmation of a plan requires that each holder of a Claim or Equity Interest either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Code. To determine what holders of Claims and Equity Interests of each impaired class would receive if the Debtors were liquidated under Chapter 7, the Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a hypothetical Chapter 7 liquidation case. The cash amount which would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by the unencumbered cash held by the Debtors at the time of the commencement of the hypothetical liquidation case. Such cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that might result from the termination of the Debtors' business and the use of Chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee might engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of claims and other claims which might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors during the Chapter 11 Cases such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay general unsecured claims.

To determine if the Plan is in the best interests of each Impaired Class, the present value of the Distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amount attributable to the foregoing Claims, are then compared with the value of the property offered to such Classes of Claims and Equity Interests under the Plan.

After considering the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for Distribution to Creditors in these Cases, including the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less, and is likely higher, than such holder would receive pursuant to liquidation of the Debtors under Chapter 7.

The Debtors also believe that the value of any Distributions to each Class of Allowed Claims in a Chapter 7 case would be less than the value of distribution under the Plan because such Distributions in a Chapter 7 case would not occur for a substantial period of time after such Case were to begin. It is likely that distribution of the proceeds of the liquidation could be delayed after the completion of such liquidation in order to resolve Claims and prepare for

18513698v1  0920630

Distributions. In the likely event litigation was necessary to resolve Claims asserted in the Chapter 7 cases, the delay could be prolonged.

## VIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated alternatives to the Plan, including the liquidation of the Debtors. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries by parties in interest, assuming confirmation of the Plan. The following discussion provides a summary of the Debtors' analysis leading to its conclusion that a liquidation or alternative plan of reorganization would not provide the highest value to parties in interest.

### A.    Liquidation Under Chapter 7

If no plan of reorganization can be confirmed, the Debtors' Cases may be converted to cases under Chapter 7 of the Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to its creditors in accordance with the priorities established by the Code.

People's holds a blanket lien against most of the Debtors' assets with the exception of certain assets where other secured lenders may have perfected a purchase money security interest against certain cranes. Thus, any value realized with respect to these assets would be primarily for the benefit of People's or other secured lenders. Even so, the Debtors believe the holders of Secured Claims would receive less for their Collateral in a liquidation than the Debtors propose to distribute under the Plan. Moreover, in the event of a liquidation, a trustee would be appointed, who would likely retain other professionals, and any recoveries received on account of Actions would likely be used to satisfy the additional administrative claims. Consequently, there would likely be no benefit realized for unsecured creditors. Attached as Exhibit "D" is the Debtors' projected Liquidation Analysis, which demonstrates the likelihood of no recovery for Unsecured Creditors in the event of liquidation.

### B.    Dismissal

If the Plan is not confirmed, the Court could dismiss the Cases. If the Cases are dismissed, it is likely that secured lenders would foreclose on the Liens securing their Claims, resulting in little, if any, recovery for general Unsecured Creditors. The Plan provides for a more orderly distribution of assets, and Distributions, to holders of Allowed Claims.

## IX.

## FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims. The following

18513698v1 0920630

summary does not address the federal income tax consequences to holders whose Claims are entitled to reinstatement or payment in full in cash under the Plan (e.g., holders of Administrative Claims, Other Priority Claims, and Secured Claims).

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities).

This discussion assumes that the various debt and other arrangements to which the Debtors is a party will be respected for federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

### B.    Consequences to the Debtors

#### 1.    Cancellation of Debt

The Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes - such as net operating loss ("NOL") carryforwards, current year NOLs, tax credits and tax basis in assets --by the amount of any cancellation-of-indebtedness income ("COD") realized by such debt in connection with the bankruptcy case. COD is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds the fair market value of any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction). On August 29, 2003, the IRS issued proposed and temporary regulations addressing the method for applying the attribute reduction described above to an affiliated group filing a consolidated federal income tax return. The regulations are effective with respect to COD occurring after August 29, 2003.

18513698v1  0920630

As a result of the potential discharge of Claims pursuant to the Plan, the Debtors may realize COD. The extent of such COD and resulting tax attribute reduction will depend, in part, on the value of Distributions. Consequently, there could be material reductions the attributes (including consolidated NOL carryforwards and current year NOLs (if any)) of the Debtors. Other tax attributes may also be reduced. To the extent that asset basis is reduced, depreciation or amortization of assets would also be reduced, and gain recognized (and therefore tax imposed) in connection with the disposition of such assets may be increased.

### 2. Alternative Minimum Tax

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes). However, recent legislation provides for a temporary waiver of this limitation for AMT NOL carrybacks or carryforwards originating in years ending in 2003, 2004, or 2005.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

### C. Consequences to Holders of Certain Claims

### 1. Consequences to Holders of Unsecured Claims

Pursuant to the Plan, holders of Unsecured Claims will receive, in satisfaction and discharge of their Claims, Cash. It is not estimated that holders of Allowed Unsecured Claims will be paid in full.

### 2. Distributions in Discharge of Accrued but Unpaid Interest

In general, to the extent that any amount received by a holder of a Claim is received in satisfaction of accrued interest, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized original issue discount ("OID") was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a security, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly it is also unclear whether, by analogy, a holder of a Claim with previously included OID that is not paid in full would be required to recognize a capital loss rather than an ordinary loss.

Pursuant to the Plan, all distributions in respect of Claims will be allocated first to the principal amount of such Claims, as determined for federal income tax purposes, and thereafter, to the portion of such claim, if any representing accrued but unpaid interest. However, there is no assurance that such allocation will be respected by the IRS.

18513698v1 0920630

Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest or amortized OID for tax purposes.

### 3.    Information Reporting and Withholding

All distributions to holders of Claims under the Plan are subject to any applicable withholding (including employment tax withholding).  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" (currently, at the rate of 28%).  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

*The foregoing summary has been provided for informational purposes only.  All holders of Claims are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Plan.*

## X.

## CONCLUSIONS AND RECOMMENDATIONS

Based upon the foregoing, the Debtors believe that confirmation of the Plan will provide the greatest recovery for all holders of Allowed Claims against the Debtors, and recommend that all holders of Allowed Claims and Equity Interests in Classes that are Impaired and entitled to vote on the Plan vote to accept the Plan.

18513698v1 0920630

ZEIGER CRANE RENTAL, INC., *et al.*,

CASE NO. 11-14183-BKC-EPK (Jointly Administered)

DISCLOSURE STATEMENT

[ Signature Page ]

ZEIGER CRANE RENTAL, INC.,

By:_____
    Steve Zeiger, President

ATLANTIC LEASING, INC.,

By:_____
    Steve Zeiger, President

DYER ROAD PROPERTY, LLC,

By:_____
    Steve Zeiger, Sole Member

_____
Michael D. Seese
Florida Bar No. 997323
HINSHAW & CULBERTSON LLP
One East Broward Boulevard
Suite 1010
Ft. Lauderdale, FL 33301
Telephone:  954-467-7900
Facsimile:  954-467-1024
Attorneys for Debtors

18513698v1 0920630